IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-10336

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RICHARD VAN WEIR,

Defendant-Appellant.

--------------------------------------------------------------
Appeal from the United States District Court
for the Northern District of Texas, Dallas
3:99-CR-54-1-R
October 23, 2001

Before KING, Chief Judge, and JOLLY and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge[1] :

A jury convicted appellant Richard Van Weir ("Weir") of one count of conspiracy to

commit mail fraud in violation of 18 U.S.C. § 371 and thirteen counts of mail fraud in violation of

18 U.S.C. §§ 1341 & 1342. Weir was sentenced to 121 months of prison and ordered to pay

$1,668,632.64 in restitution to his victims. Weir appeals, contending that his conviction should be

reversed due to perceived trial errors and flaws in the underlying indictment. Weir also challenges

his sentence, contending that the district court improperly applied the sentencing guidelines in

---

[1]Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5th Cir. R.
47.5.4.

1

calculating the amount of loss for the purposes of U.S.S.G. § 2F1.1 and in imposing an obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1. Finally, Weir contends that the district court's restitution order was not supported by the record. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and we affirm Weir's conviction and the custodial portion of his sentence, but vacate the restitution award and remand for further proceedings.

I.

FACTUAL BACKGROUND

Weir was an insurance broker. He developed a specialty selling insurance for firms operating high-risk equipment. This class of insurance is not generally available from insurance companies in the American market. Instead, these types of high-risk policies, termed "surplus lines," are generally underwritten through the London insurance market.

Weir's business method was fairly simple, operating as follows: when Weir had a client needing insurance he would submit an application to a broker, Maclean, Oddy & Assoc. ("Maclean"), who would correspond with a London based broker, Regis Low, Ltd. ("Regis"). Regis would then consult London-based underwriters to obtain a quote.[2] This quote was based on the insured's gross receipts. At the beginning of the policy period, the insured would estimate its receipts for the coming year. Based on that estimate it would pay to Weir what is termed a "minimum and deposit premium." Weir would deduct his commission from that premium and remit the remainder to the London-based broker. At the end of a policy period, the insured would provide its actual gross receipts. If they were higher than the estimate, there would be an "audit

---

[2]Subsequently, Weir began bringing business directly to Regis and, later still, Weir began to use different London-based brokers and underwriters. Regardless, the process remained substantially the same.

2

premium" due. Again, Weir would deduct his commission from the premium and remit the remainder. Finally, the premium payments sent to Weir ordinarily included an additional amount earmarked for payment of the Texas state taxes applicable to surplus lines insurance. Weir was responsible for remitting these payments to the state of Texas.

Weir's fraudulent scheme was similarly uncomplicated: rather than remitting to the brokers all the audit premiums as required by contract and to Texas all the state taxes as required by law, Weir simply kept $2,220,000 worth of the audit premiums and $10,600 of the taxes. In order to facilitate his fraud Weir: (1) did not inform the brokers, underwriters or insureds that he was withholding the audit premiums; (2) sent brokers false revenue figures; (3) refused, despite requests, to provide the brokers with audit figures that would indicate that audit premiums were due; (4) inexplicably kept records of the audit premiums (that were not thrown away) separate from other policy-related material; (5) failed to report the audit premiums to the Surplus Lines Stamping Office[3]; and (6) booked audit premiums to accounts held in the names of non-existent business entities.

As noted above, on February 18, 1999, the United States of America (the "Government") indicted Weir on 13 counts of mail fraud (18 U.S.C. §§ 1341 & 1342) and a single count of conspiracy to commit mail fraud (18 U.S.C. § 371). With respect to Counts 2-14, the indictment provides as follows:

> 1. The Grand Jury adopts, realleges, and incorporates by reference the allegations contained in the introduction of this Indictment contained in Count 1.

---

[3]This failure to report facilitated the fraud, in part, because the underwriters had access to information on audit premiums submitted to the Surplus Lines Stamping Office and, in part, because the Surplus Lines Stamping Office used this information to calculate the taxes that Weir was responsible for paying to the comptroller.

2. On or about the dates listed below in the Dallas Division of the Northern District of Texas, Defendants Richard Van Weir and Elaine Watson Garner, and others known and unknown to the grand jury, for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises and attempting to do so willingly and knowingly caused to be delivered by the United States Postal Service according to the directions thereon, envelopes addressed to [Weir] at the address listed below, containing the matter described below, each such use being a separate and additional count in this indictment.

These two paragraphs of the indictment are followed by a numbered list, corresponding to Counts 2-14, where the existence of a mailing, the date of delivery, the matter mailed, and the addressee are alleged.

Because Weir did not dispute withholding the audit premiums, the primary issue at trial was Weir's intent. The Government's position at trial was that Weir's failure to pay the audit premiums to the London-based brokers was simply part of Weir's fraudulent scheme to obtain money to which he was not entitled. Weir's position at trial was that the audit premiums were withheld as offsets, asserting two separate bases: (1) that the London-based brokers breached exclusivity agreements with him; and (2) that he was afraid that he could be civilly liable to the insureds in light of policy language in the insurance contracts, which he interpreted as potentially requiring a refund of over-estimated minimum and deposit premium.

II.

WEIR'S CHALLENGES TO THE INDICTMENT

Weir contends that the indictment was flawed for two reasons. First, he contends that Counts 2-14 are vague and ambiguous as to the scheme or schemes to defraud and the victim or victims defrauded. He asserts that this ambiguity arose because the Government used confusing incorporation language in paragraph 1 of Counts 2-14, leaving him confused as to whether the

4

Government had incorporated only the introduction to the conspiracy count or the entire conspiracy count. Second, he contends that the indictment does not contain an allegation that he made material misstatements, i.e. that the indictment does not allege all of the elements of fraud.

"The purpose of the indictment is to allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding. The proper test for determining the validity of the indictment is whether the defendant has been prejudiced by the alleged deficiency." United States v. Morrow, 177 F.3d 272, 296 (5th Cir. 1999) (citations omitted). Because Weir does not assert that he lacked notice of the crime of which he stood accused, and because he did not raise either of these two challenges to the indictment before his conviction, the indictment is reviewed with "maximum liberality" and should be found sufficient "unless it is so defective that by any reasonable construction, it fails to charge the offense for which the defendant is convicted." United States v. Lankford, 196 F.3d 563, 569 (5th Cir. 1999), *cert. denied*, 120 S.Ct. 1984 (2000).

As to Weir's first argument, we hold that the incorporation language in paragraph 1 of Count 2-14 is not ambiguous—it unambiguously incorporates the introduction to the conspiracy count and no more. See United States v. Huff, 512 F.2d 66, 69 (5th Cir.1975) ("[A]llegations made in one count may be incorporated by reference in another count. But each count of an indictment must be regarded as if it were a separate indictment and must stand on its own content without dependence for its validity on the allegations of any other count not expressly incorporated."). In that introduction the Government alleges: "[Weir] billed and collected audit premiums from insured's [sic] and the producing agents, however [Weir] failed to pay over those

5

premiums to the London Brokers." This allegation clearly and simply frames the scope of Weir's fraudulent scheme to defraud three primary victims: the insureds who paid Weir the premiums believing that Weir would pay them to the brokers/underwriters, and the brokers and underwriters who believed that they were being paid all of the premiums to which they were entitled.

Weir's contention with respect to the materiality element is similarly unavailing. "[A] matter is material if: (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." United States v. Richards, 204 F.3d 177, 191 (5th Cir. 2000) (citation omitted). Although materiality was not alleged by the Government explicitly, the materiality of the representations can be reasonably inferred from Counts 2-14 and the introduction to the conspiracy count. See Richards, 204 F.3d at 192 ("[I]f the facts alleged in the indictment warrant an inference that the false statement is material, the indictment is not fatally insufficient for its failure to allege materiality in haec verba.") (citing United States v. McGough, 510 F.2d 598 (5th Cir.1975)). The scheme alleged was Weir's plan to get money to which he was not entitled from the insureds. It is alleged in Counts 2-14 that by "means of false and fraudulent pretenses, representations and promises...[Weir]...caused to be delivered by the United States Postal Service...envelopes containing [13 checks]." Because it is alleged that the fraudulent activity caused the money at the heart of the scheme to be sent, it can be inferred that this fraudulent

6

activity was material.[4]

III.

WEIR'S CHALLENGES TO THE DISTRICT COURT'S EVIDENTIARY RULINGS

Weir contends that the district court erred when it: (a) admitted expert testimony from Derrick Stimpson, Richard March, Philip Ballinger, Anthony Carnevale, Edward Skidmore, Brennan Pateman and James Mathine without qualifying them as experts; (b) admitted the testimony of James Mathine as summary testimony; (c) admitted hearsay testimony of Kenny King; and (d) granted the Government's motion in limine and excluded evidence that Generali had failed to pay claims of Holocaust victims.

This Court utilizes two distinct standards in reviewing challenges to evidentiary rulings. When we review a trial court's ruling on the admissibility of evidence, to which the appellant made a sufficient objection at trial, the standard of review is abuse of discretion, see United States v. Skipper, 74 F.3d 608, 612 (5th Cir.1996), and we will affirm the evidentiary rulings "unless an error in admitting evidence is shown to have exerted a substantial impact on the verdict." See United States v. Valdez, 722 F.2d 1196, 1204 (5th Cir. 1984); Fed. R. Evid. 103.

In contrast, if the appellant failed to object to the evidence at trial, this Court reviews for

---

[4]In addition, Weir contends, generally, that the "jury was permitted to convict appellant of conduct which does not constitute mail fraud" because it might have premised its verdict on his failure to report audit premiums to the Surplus Lines Staffing Office. This Court cannot properly address this abstract and highly speculative argument because Weir has failed to identify the error that allowed this problem to occur. Regardless, having reviewed the entire record, it is clear that Weir was not convicted for defrauding Texas of its interest in regulating the surplus lines insurance market. The Government made clear that its position was that Weir's failure to report audit premiums to the Surplus Lines Stamping Office was part of his scheme to defraud the insurers of the audit premiums. This act facilitated that scheme by making it more difficult for the insurers to discover that he was withholding audit premiums.

7

plain error.  United States v. Richardson, 168 F.3d 836, 838 n.9 (5th Cir. 1999).  "We follow a four step analysis for 'plain error' review:  (1) there must be an 'error,' i.e., a 'deviation from a legal rule,' that has not been waived;  (2) the error must be 'plain,' i.e., 'clear' or 'obvious' under current law;  (3) the error must 'affect substantial rights,' i.e., it must have affected the outcome of the proceeding;  and, (4) even if the error was 'plain' and 'affected substantial rights,' the Court of Appeals, exercising its discretion, should correct the error only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  United States v. Burton, 126 F.3d 666, 674 (5th Cir. 1997).  Put another way, "[w]hen reviewing for plain error, this court asks whether the trial court committed an error which resulted in a 'manifest miscarriage of justice.'"  Knight v. Caldwell, 970 F.2d 1430, 1432 (5th Cir. 1992).

We address each of Weir's four contentions in turn.

### a.  Expert Testimony

Weir failed to raise a proper objection, at trial, to all but one of the pieces of purported expert testimony now challenged as inadmissable[5]— the only exception being his objection to Ballinger's testimony as to how minimum and deposit premiums work, i.e. that a minimum deposit premium is not refundable.[6]  We need not address the question whether any of this testimony was admitted erroneously as Weir has failed to explain how admission of any of this

---

[5]Weir objected to March's testimony, citing foundation, hearsay, leading and Fed. R. Evid. 408 as grounds; he did not object to the testimony as improper expert testimony.  Cf. Burton, 126 F.3d 666, 671 (5th Cir. 1997) ("An Appellant must raise an objection to the admission of evidence at trial such that the issue is presented to the district court 'with sufficient specificity.'").

[6]In fact it appears that in this objection Weir conceded the admissibility of the other pieces of testimony now challenged.  See T.R. V10 6:17-20 ("Your Honor, excuse me.  We don't object to agents and brokers, but we do object to this man being offered as an expert witness.  He has not been so designated.").

8

testimony provides a basis for reversal.

As to Ballinger's testimony, it clearly did not exert substantial impact on the verdict as numerous witnesses, including Jerry Don Moody, Eddie Skidmore, Ian Douglas Marson, Brennan Pateman, Derrick Stimpson, Richard March, Kathy Wilson, Debra Allen, and Jennifer Zachry gave similar testimony. In fact much of this testimony was elicited by Weir in cross-examination. See e.g. T.R. V.6 165:8-11 (cross-examination of Marson) ("Q. So this was something—this minimum and deposit thing was something that was known throughout the industry. Is that what you're saying? A. Yes."). Cf. United States v. Raymer, 876 F.2d 383, 388 (5th Cir. 1989) ("[W]hen injection of inadmissible evidence is attributable to the actions of the defense, the defense cannot later object to such 'invited error.'").

As to the numerous pieces of evidence that Weir now challenges for the first time on appeal, the only harm identified by Weir is as follows: (1) that Stimpson's testimony on industry practices, i.e. that non-refundable minimum and deposit premiums are industry practice, cut against his defense that he withheld audit premiums as an offset because he feared that the insureds would demand refunds of the premiums; (2) that Stimpson implied that Weir had breached his duty of good faith in withholding the audit premiums; and (3) that March compared Weir's "booking" practices to the industry standard unfavorably. Having reviewed the entire record, we conclude that none of these pieces of testimony affected the outcome of Weir's trial, individually or collectively. As to the first "harm," as discussed above, testimony similar to Stimpson's was elicited by Weir on cross examination. As to the latter two, this evidence is of marginal relevance to the key issue in this case—whether Weir kept the audit premiums with the intent to defraud the insurers. There was ample evidence that he did, including, but not limited to:

9

his failure to inform the insurers that he was withholding the premiums until it was discovered independently; his destruction of documents that would have allowed the insurers to calculate the premiums withheld; his failure to segregate the audit premiums from other funds; his booking of the audit premiums to fictitious business entities connected to personal purchases; and his failure to tell any of his employees or the insureds that he was withholding the audit premiums as an offset until after his fraud was discovered independently.

### b. Summary Testimony

Weir contends that the district court erroneously admitted, as summary testimony, the testimony of James Mathine, a United States Postal Inspector, regarding the contents and meaning of bank records. Weir further contends that Mathine's testimony summarizing various bank records was harmful because the testimony suggested that he had spent the audit premiums on personal expenses (a boat, car and lake home), which he contends undercut his claim that the money was withheld as a potential setoff.

Although Weir objected, generally, to Mathine testifying as a summary witness and made hearsay objections to specific pieces of testimony, Weir never objected to any of Mathine's testimony as being improper summary testimony. Cf. Burton, 126 F.3d at 671 ("An Appellant must raise an objection to the admission of evidence at trial such that the issue is presented to the district court 'with sufficient specificity.'"). As there was no proper objection, we will review for plain error. See Richardson, 168 F.3d at 838 n.9.

"The use of summary testimony and documents is governed by Rule 1006 of the Federal Rules of Evidence, which is broadly interpreted. Rule 1006 allows admission of summaries when (1) the evidence previously admitted is voluminous, and (2) review by the jury would be

10

inconvenient.  A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case."  United States v. Bishop, No. 00-20282,  ___ F.3d ____, 2001 WL 994916, * 5 (5th Cir. Aug. 29, 2001).

As noted above, Weir does not contend that the bank records summarized by Mathine were insufficiently voluminous to be a  proper subject of summary testimony.  As Mathine simply summarized the contents of the bank records at issue, e.g. summarizing where the bank records indicated various sums of money went, we hold that admission of Mathine's testimony as summary testimony was not error.  To the extent that Mathine did draw any conclusions from the bank records, he did not do so until questioned on cross-examination.  See Raymer, 876 F.2d at 388.

### c.  Hearsay

Weir contends that the court erroneously admitted, over his hearsay objection, the testimony of two witnesses who testified as to out-of-court statements made by Kenny King, one of Weir's former employees.  The district court seems to have concluded that Kenny King's statements, which were made to expose Weir's fraudulent scheme, were non-hearsay because they were statements made in furtherance of a conspiracy.  See Fed. R. Evid. 810(d)(2)(E); Burton, 126 F.3d at 671 ("Before admitting a co-conspirator's statement under this Rule, the court must determine by a preponderance of the evidence (1) that there was a conspiracy involving the declarant and the non-offering party, and (2) that the statement was made 'during the course and in furtherance of the conspiracy.'") (citation omitted). Weir further contends that admission of these statements was not harmless error because King's statements that Weir used the audit premiums he withheld for personal expenditures and held the money in accounts of fictitious

11

business entities undercut Weir's claim that the money was withheld as a potential setoff.  The Government concedes that admission of this testimony was an abuse of discretion, but asserts that admission of these statements was harmless because similar testimony was properly admitted.

Because Weir sufficiently objected to this evidence on hearsay grounds at trial, we review the district court's ruling for abuse of discretion, see Skipper, 74 F.3d at 612, and will affirm the ruling unless the error is shown to have exerted a substantial impact on the verdict.  See Valdez, 722 F.2d at 1204.  The district court's implied determination that the statements were made in furtherance of the conspiracy, however, is a finding of fact which will be reversed only if clearly erroneous.  See United States v. Snyder, 930 F.2d 1090, 1095 (5th Cir. 1991).

It is undisputed that King made the statements at issue for the purpose of exposing  Weir's fraudulent activity.  Therefore the trial court's finding that King's statements were made in furtherance of the conspiracy was clearly erroneous.  See e.g. United States v. Williams, 87 F.3d 249, 254 (8th Cir. 1996) ("Post-arrest confessions or statements incriminating others by one coconspirator are generally not made in furtherance of a conspiracy."); Fuson v. Jago, 774 F.2d 55, 61 (6th Cir. 1986) (concluding that a custodial confession is not in furtherance of a conspiracy).  But this error did not exert substantial impact on the verdict.  Weir concedes that the portion of King's statements that he contends is prejudicial was cumulative to Mathine's testimony, which as discussed above, was properly admitted.

### d.  Reputation

Weir contends that the district court erred in preventing him from offering evidence that Generali, one of the underwriters allegedly defrauded, had failed to pay numerous claims of Holocaust victims who had held insurance policies through the company.  Weir contends that the

12

Government "opened the door" to admission of this testimony when it elicited testimony from a broker that Generali had a "good reputation" in the insurance business. Weir asserts that Generali's manner of doing business was critical to his defense because he grounded his defense on his belief that Generali had cheated and lied to him.

"The right and opportunity to cross-examine an adverse witness is guaranteed by the sixth amendment. However, the district court is given wide latitude in imposing reasonable restraints upon defendant's right to cross-examination." See United States v. Townsend, 31 F.3d 262, 268 (5th Cir.1994).

Neither the Government, in objecting, nor the trial court, in sustaining the objection, expressly stated the basis for excluding this testimony, but this testimony was clearly inadmissible under either Fed. R. Evid. 402 or 403. See Metallurgical Indus. Inc. v. Fourtek, Inc., 790 F.2d 1195, 1207 (5th Cir.1986) ("We may not disturb the district court's exclusion of the evidence, however, if that ruling can be upheld on other grounds, regardless of whether the court relied on those grounds."); see also United States v. Hooker, 997 F.2d 67 (5th Cir. 1993) ("This court has held that [] detailed findings [under Fed. R. Evid. 403] are not required if the factors upon which the probative value/prejudice evaluation were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling.").

It is unclear how this evidence is even remotely relevant. Despite Weir's assertion that Generali's "character" was critical to his defense, it is difficult to understand how Generali's treatment of Holocaust victims was relevant to its treatment of Weir. Furthermore, even if Generali was a "bad" company, and Weir was aware of this fact, it is difficult to understand why this would have given him the right to withhold the audit premiums. It apparently did not prevent

13

Weir from doing business with Generali in the first place. The potentially prejudicial nature of this testimony is plain. Therefore, the district court did not abuse its discretion when it excluded evidence of Generali's purported treatment of Holocaust victims. In any event, even assuming, arguendo, that the district court did abuse its discretion when it excluded this evidence, the error would not have provided a basis for reversing the conviction because the exclusion did not substantially impact the verdict.

IV.

WEIR'S CHALLENGES TO HIS SENTENCE

Weir contends that the district court erred in calculating his sentence when it added an obstruction of justice upward adjustment to his base offense level pursuant to U.S.S.G. § 3C1.1. In support of this contention Weir asserts that the court erred in finding as a factual matter that: in the context of a settlement negotiation with underwriters, he offered to settle if the underwriters agreed to write prosecutors a letter to the effect that their dispute with him had been a business mistake. He further asserts that even if this conduct could constitute obstruction of justice as a matter of law, the court erred in failing to make an express finding that he **wilfully** obstructed justice.[7] In addition, Weir contends that the district court erred in calculating the amount of loss occasioned by his fraud for the purpose of applying the sentencing guidelines. Finally, Weir

_____

[7]Weir also cites Fed. R. Evid. 408 and United States v. Hays, 872 F.2d 582, 588 (5th Cir. 1989) for the proposition that it is "plain error to permit government(sic) to introduce settlement negotiations to show scope of conspiracy in criminal proceeding (sic)." This citation implies that the court impermissibly relied on inadmissable testimony in making its obstruction finding. This citation is very misleading as the panel in Hays specifically noted that "Federal Rule of Evidence 408 permits evidence of settlement agreements for purposes other than proving liability, such as demonstrating the prejudice of a witness, negativing a contention of undue delay, or **establishing the obstruction of a criminal investigation**." Id. at 588-89 (emphasis added).

14

contends that the district court's restitution order lacked an evidentiary basis.

### a. Obstruction of Justice

"This Court reviews the district court's interpretation or application of the Sentencing guidelines de novo and its factual findings, such as a finding of obstruction of justice, for clear error. As long as a factual finding is plausible in light of the record as a whole, it is not clearly erroneous. We uphold a sentence unless it was imposed in violation of law or as a result of an incorrect application of the Sentencing Guidelines or it is outside the range of the applicable guideline and is unreasonable." United States v. Huerta, 182 F.3d 361, 364 (5th Cir. 1999) (citations omitted). "Although a district court must resolve disputed issues of fact if it intends to use those facts as a basis for sentencing, the court can adopt facts contained in a PSR without inquiry, if those facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence. A defendant's rebuttal evidence must demonstrate that the information contained in the PSR is materially untrue, inaccurate or unreliable, and mere objections do not suffice as competent rebuttal evidence." Id.

The only evidence submitted by Weir to rebut the finding in the PSR that he asked the underwriters to write the aforementioned letter is an affidavit submitted by Weir's attorney to the effect that **he** conducted the negotiations with the underwriters and was unaware of any communication between the underwriters and Weir. Assuming this to be true, the affidavit was not directly inconsistent with the presentence report, and therefore the trial judge's implicit finding, through adoption of the presentence report, that Weir offered to settle a civil matter on the condition that the underwriters write to prosecutors, was not clearly erroneous.

Weir correctly notes that in order to qualify for an obstruction of justice enhancement, the

15

defendant's conduct must be wilful, i.e. the defendant must specifically intend that his or her actions obstruct justice. See United States v. Greer, 158 F.3d 228, 239 (5th Cir. 1998). But, neither the Fifth Circuit nor any other circuit has required an express finding of wilfulness. See United States v. Doe, 149 F.3d 634, 641 (7th Cir. 1998) ("Although the district court did not employ the word 'willful' in making its findings, the court's reasoning plainly reveals its judgment that Doe deliberately gave false testimony.") (perjury context); United States v. Lambros, 65 F.3d 698, 702 (8th Cir. 1995) (same). Clearly wilfulness can be inferred here because the only possible reason Weir could have had for asking the underwriters to send the letter to prosecutors was to obstruct the investigation—the request served no other apparent purpose.

### b. Loss Calculation

"Although the determination of loss is a factual finding reviewed for clear error, the court's choice of the method by which losses are determined involves an application of the sentencing guidelines, which is reviewed de novo." United States v. Deavours, 219 F.3d 400, 402 (5th Cir. 2000). "In order to satisfy this clear error test all that is necessary is that the finding be plausible in light of the record as a whole." United States v. Humphrey, 104 F.3d 65, 71 (5th Cir. 1997).

"For sentencing-guideline purposes, loss means the value of the property taken." Deavours, 219 F.3d at 402. "A 'loss' under [U.S.S.G. 2F1.1] means the actual or intended loss to the victim, whichever is greater. Further, the amount of loss need not be determined with precision. The district court need only make a reasonable estimate given the available information." United States v. Izydore, 167 F.3d 213, 222 (5th Cir. 1999). "[T]he amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by

16

misappropriating money or other property." Devours, 219 F.3d at 402.

The district court, ostensibly relying on the presentence report, concluded that the amount of loss was within the $1.5 million to $2.5 million range, resulting in a twelve-level increase pursuant to U.S.S.G. § 2F1.1. This number was based on the total amount of audit premiums collected by Weir minus his average commission, i.e. the amount Weir should have paid to the brokers/underwriters, but did not. This number is an accurate representation of Weir's intended fraudulent misappropriation.

In objecting to the loss calculation, Weir did not contend that the amount of total audit premiums collected, or the commission percentage used, were incorrect. See Huerta, 182 F.3d at 164, *supra*. Instead, he merely contended that the actual loss was much smaller because the alleged victims breached contracts with him and because they settled for a smaller amount. Even assuming, arguendo, that these are relevant considerations in determining actual loss, the district court did not err by utilizing the larger "intended loss" figure.

### c. Restitution

Finally, Weir contends that the district court's calculation of restitution was clearly erroneous because it was not supported by the addendum to the presentence report and ignored his rebuttal evidence. Specifically, Weir contends that it is unclear whether the figure in the addendum to the presentence report included attorney's fees and deducted for payments made by Weir to the victims in civil settlements. The Government concedes that there is a lack of evidentiary support for the restitution order, which would necessitate remand, absent reference to

17

a letter it seeks to have added to the record through its motion pursuant to Fed. R. App. P. 10(e)[8]

to supplement the record.[9] Because we DENY that motion to supplement the record, we vacate

the restitution award and remand for further factual findings on the restitution issue.

V.

CONCLUSION

Appellee's motion to supplement the record is DENIED. For the reasons stated above,

we AFFIRM Weir's conviction and his sentence except with respect to the district court's

restitution order. We VACATE the district court's restitution order, and REMAND for an

additional finding on the appropriate amount of restitution.

---

[8]Fed. R. App. P. 10(e)(2)(C) provides, in pertinent part: "If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded: by the court of appeals."

[9]We deny the Government's motion. Both parties agree that the judge did not have possession of this letter (which was used by the Probation Office in drafting the presentence report), and that it was not part of the court record. Accordingly it is not the proper subject of a motion to supplement the record pursuant to Fed. R. App. P. 10(e)(2)(C). See Kemlon Products and Development Co. v. United States, 646 F.2d 223, 224 (5th Cir. 1981) ("A court of appeals will not ordinarily enlarge the record on appeal to include material not before the district court."); see also United States v. Kennedy, 225 F.3d 1187, 1991 (10th Cir. 2000) ("Because the affidavit was not before the district court, Rule 10(e) does not countenance supplementing the record in this instance."); In re Capital Cities, 913 F.2d 89, 96 (3d Cir.1990) ("This Court has said on numerous occasions that it cannot consider material on appeal that is outside of the district court record.") (citing Fed. R. App. P. 10(a)); United States v. Hillsberg, 812 F.2d 328, 336 (7th Cir. 1987) ("Rule 10(e) does not give this court authority to admit on appeal any document which was not made a part of the record in the district court."); United States v. Walker, 601 F.2d 1051, 1054-56 (9th Cir.1979); ("Rule 10(e) cannot be used to add to or enlarge the record on appeal to include material which was not before the district court."); cf. Gibson v. Blackburn, 744 F.2d 403, 405 n.3 (5th Cir. 1984) ("Here, we decide to exercise our discretion to consider the photograph, rather than to remand this case to the district court and prolong a case which has wound its way through courts for the past six years. The proper resolution of this issue is not in doubt, and a remand would be contrary to both the interests of justice and the efficient use of judicial resources."); Kennedy, 225 F.3d at 1191 (recognizing the existence of the court's "inherent equitable authority" to supplement the record on appeal to include material not before the district court.).

18