# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

———————

m. 99-20906

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

HAROLD DEAVOURS,

Defendant-Appellant.

———————————

Appeal from the United States District Court
for the Southern District of Texas

———————————

July 13, 2000

Before JOLLY, SMITH, and BARKSDALE,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Harold Deavours pleaded guilty to wire
fraud and aiding and abetting related to his in-
volvement in a "Ponzi scheme." He challenges
the method by which the district court calcu-
lated the amount of total loss and objects to
the failure to find that he played only a minor
role in the scheme. Finding no merit in Dea-
vours's challenges, we AFFIRM.

I.

Deavours worked as a financial consultant
for Smith Barney, Inc., and helped to open an
account at Smith Barney in the name of Elder-
way Investments, Ltd. ("Elderway"), into
which foreign investors wired money. When
an investor transferred money into the Smith
Barney account, Deavours signed a "receipt-
of-funds" letter; he knew he lacked authority
to sign the letters and knew that his co-defen-
dants were using these letters to cause inves-
tors to transfer money for participation in what
the investors believed to be an investment pro-

gram backed by Smith Barney.

Smith Barney's credit department ordered a halt to all transfers coming into Elderway's account. Deavours, however, continued thereafter to sign receipt-of-funds letters on behalf of Smith Barney. The letters signed by Deavours after that date induced investors to transfer approximately $40 million to bank accounts, allegedly for the benefit of Smith Barney. Deavours knew that Smith Barney did not have any connection to the accounts and was not receiving any of the $40 million.

Deavours pleaded guilty to wire fraud and aiding and abetting. The court held, over Deavours's objection, that his crime occasioned the loss of about $53 million, representing the amount fraudulently received from "clients," not reduced by the amount paid back as a continuation of the scheme. The court found this to be the "intended loss" of the scheme. The court also rejected Deavours's request that the offense level be decreased by two in recognition of his allegedly minor role in the offense. The government then asked for, and the court granted, a four-level downward departure.

## II.

"Review of sentences imposed under the guidelines is limited to a determination whether the sentence was imposed in violation of law, as a result of an incorrect application of the sentencing guidelines, or was outside of the applicable guideline range and was unreasonable." *United States v. Matovsky*, 935 F.2d 719, 721 (5th Cir. 1991). "We accept district court fact findings relating to sentencing unless clearly erroneous, but review de novo application of the Guidelines." *United States v. Fitzhugh*, 984 F.2d 143, 146 (5th Cir. 1993).

## III.

The court determined that the amount of "intended loss" was $52,954,538, the total amount of 235 wire transfers received by the defendants. Accordingly, under the sentencing guidelines, the base offense level of six was increased by seventeen. *See* United States Sentencing Commission, GUIDELINES MANUAL, § 2F1.1(b)(1)(R). Deavours objects that the amount of the loss should be reduced by $29,375,666——the sum returned to investors in the form of payments, represented as profits to further promote the Ponzi scheme——to approximately $24,000,000, and that, under U.S.S.G. § 2F1.1(b)(1)(Q), his offense level should be increased by only sixteen.

Although the determination of loss is a factual finding reviewed for clear error, the court's choice of the method by which losses are determined involves an application of the sentencing guidelines, which is reviewed *de novo*. *United States v. Saacks*, 131 F.3d 540, 542-43 (5th Cir. 1997). As we have explained,

> [i]n a Ponzi scheme, a swindler promises a large return for investments made with him. The swindler actually pays the promised return on the initial investments in order to attract additional investors. The payments are not financed through the success of the underlying venture but are taken from the corpus of the newly attracted investments. The swindler then takes an appropriate time to abscond with the outstanding investments.

*United States v. Cook*, 573 F.2d 281, 282 n.3 (5th Cir. 1978). For sentencing-guideline purposes, "'[l]oss' means the value of the property taken. . . ." U.S.S.G. § 2B1.1, comment. (n.2); *see* § 2F1.1, comment. (n.8).

2

We know of no case from this circuit discussing calculation of losses related to a Ponzi scheme for purposes of § 2F1.1(b)(1). In *United States v. Lauer*, 148 F.3d 766 (7th Cir. 1998), however, the court undertook the relevant inquiry:

[T]he author of a Ponzi scheme might not intend that any of his investors lose anythingSSmight intend that the scheme continue until the end of the world, in which event there would be no losers. Likewise an embezzler might not intend to impose a loss on his employer, might instead intend to use the money to gamble and win and thus be able to replace every penny he had taken. Suppose that he is caught before he has a chance to gamble with any of the money, and every cent is recovered. He is nevertheless an embezzler to the full extent of the amount he took, no matter how golden his intentions or happy the consequences . . . .

We may put it this way: *the amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk* by misappropriating money or other property. That amount measures the gravity of his crime; that he may have hoped or even expected a miracle that would deliver his intended victim from harm is both impossible to verify and *peripheral to the danger that the crime poses to the community*.

*Id.* at 767-68 (internal citations omitted; emphasis added).[1]

*Lauer* can be distinguished, because the sums returned to investors were returned after the scheme was detected, *see* 148 F.3d at 768, but the court's logic applies just as forcefully to this case, despite the distinction. Deavours and the other defendants returned money to those they had defrauded, not to compensate the victims for their losses, or to extricate themselves from wrongdoing, but conversely to extend their criminal activities and the profitability thereofSSand to place yet more property of innocent victims at risk.

Deavours's punishment should not be less if he were arrested on Saturday, having on Friday mailed out "profits" in continuation of his scheme, than if he were arrested on Friday, before that additional act of fraud and deceit had occurred. On each of those days, he had endangered by fraud the same amounts of victim money, and had exhibited equally little intent to end the scheme or mitigate the wrongdoing.

In an opinion pre-dating *Lauer,* upon which Deavours relies, that court reasoned that a defendant involved in a Ponzi scheme should not be held accountable for sums returned to investors before detection of the Ponzi scheme:

The full amount invested was not the probable or intended loss because [the defendant] did not at any point intend to keep the entire sum. Indeed, return of the moneySSthat is payment of earlier investors with the funds of later inves-

---

[1] *See United States v. Mucciante*, 21 F.3d (continued...)

[1](...continued) 1228, 1237-38 (2d Cir. 1994); *cf. United States v. Loayza*, 107 F.3d 257, 266 (4th Cir. 1997) (refusing to credit sums paid as interest to earlier investors because court found that the appellant had never intended that his victims should ultimately keep the sums paid as interest).

torsSSwas an integral aspect of [the defendant's] scheme, essential to its continuation.

*United States v. Holiusa*, 13 F.3d 1043, 1046-47 (7th Cir. 1994). The court analogized the situation to cases involving fraudulent loan applications for loans the borrower intends to repay. In the latter situation, the commentary to § 2F1.1 provides that the loss is equal to the "amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan." *Id.* at 1047 (*citing* § 2F1.1, comment. (n.7(b)) (now note 8(b)) (quotation marks omitted).

The court's comparison, though, is inapposite. A fraudulent borrower who has pledged collateral to secure a loan has never deprived the lender of more than the total of the amount of the loan less the value of the pledge; the pledge is always available for recovery. The Ponzi schemer, however, initially risks every penny, with no guarantee of any return if the scheme falls apart at the start.

Moreover, as the fraudulent borrower pays back his loan, he progressively makes good the lender, reduces overall risk, and mitigates the damage of his crime. The Ponzi schemer, on the other hand, as the *Holiusa* court recognized, makes only those payments of "profit" necessary to continue his scheme, increase the total returns from his criminal activity, and endanger yet more victims.

Deavours also points to *United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996), holding that losses relating to a Ponzi scheme should be determined by conducting an accounting of the losses incurred by each victim.

The court reasoned that individuals who receive a return or break even on their investment are not "victims" for purposes of § 2F1.1. *Id.*[2]

It is uncertain whether this methodology could be employed in the instant case, because the losses suffered by the individual investors are not known.[3] Even could we use the *Orton* method, however, we would not. It, like the *Holiusa* approach, fails to recognize that all those defrauded are victims, because their assets were placed at risk by the schemers, and that the mitigation of that risk by the schemers arose not as penance or extrication but as amplification of the fraudulent scheme.

## IV.

Deavours contends the district court erred in failing to reduce his offense level because of his minor role in the offense. The determination that a defendant did not play a minor role is a finding of fact that we review for clear error. *United States v. Brown*, 54 F.3d 234, 240 (5th Cir. 1995).

Section 3B1.2(b) of the sentencing guidelines provides for a two-level reduction for a minor participant. A minor participant is one less culpable than most other participants, but

---

[2] The court reasoned that crediting the defendant for excess returns paid to those individuals, i.e., using the "net loss" method employed by the court in *Holiusa,* would tend to understate the total loss.

[3] The court stated that detailed findings of losses to individual victims would not be required in every case involving a Ponzi scheme and that the court was required only to make a "'reasonable estimate of the loss, given the available information.'" *Orton*, 73 F.3d at 334-35 (quoting § 2F1.1, comment. (n.8) (now note 9)).

4

whose role could not be described as minimal. *See* U.S.S.G. § 3B1.2, comment. (n.3); *United States v. Zuniga*, 18 F.3d 1254, 1260 n.10 (5th Cir. 1994). Deavours "bears the burden of proving his minor role in the offense by a preponderance of the evidence." *Brown*, 54 F.3d at 241.

Deavours seizes on the government's statement in its U.S.S.G. § 5K1.1 motion that he was duped and did not know his co-defendants were running a Ponzi scheme. The government also stated, however, that Deavours's deception in signing hundreds of fraudulent receipt letters "directly caused" the investors to lose millions of dollars: "If Deavours had refused to sign the letters, few of the victims would have invested and lost money. In some cases, as the Court knows, many victims lost their entire life savings or more." The decision to sentence Deavours at the bottom of the guideline range was based, in part, on the level of his involvement. There is no clear error.

AFFIRMED.