**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 00-41479
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

VERSUS

WILLIAM MARTIN VALUCK,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas
_____

March 14, 2002

Before KING, Chief Judge, DAVIS, and MAGILL[*], Circuit Judges.

MAGILL, Circuit Judge:

Appellant William Martin Valuck was tried before a jury and convicted of one count of wire fraud, in violation of 18 U.S.C. § 1343, two counts of theft of funds valued $5,000 or more in interstate commerce, in violation of 18 U.S.C. § 2314, and one count of money laundering, in violation of 18 U.S.C. § 1956. On appeal, Valuck claims the evidence supporting his conviction under Count Five, the money laundering conviction, is insufficient, as a matter of law, that the government improperly used an accomplice's

_____

[*]Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

guilty plea to prove his guilt, and that his trial counsel was ineffective. For the reasons stated below, we affirm.

## I.

Valuck, a physician, operated a small ambulance company in Huntsville, Texas, with Mike Cleveland acting as the operations manager. Shortly after Valuck's ambulance company went out of business, Cleveland filed a d/b/a for a new business, Life Guard Services, and subsequently opened a checking account for the business at Citizens Bank in Huntsville. Cleveland was the only signatory on the account because Valuck feared that his previous tax troubles would raise questions with the Internal Revenue Service (the "IRS"), possibly resulting in a tax lien on the newly-opened account.[1]

After establishing the account, Cleveland and Valuck began soliciting various individuals in the health care industry for investment in various prime bank debenture programs. At trial, the government presented the testimony of several of the individuals whom Valuck solicited and they testified that Valuck described the potential investment as a bank trading program with low risk and a guarantee of quick returns. In particular, Valuck told Emile Roques, a pharmacist, that returns were guaranteed within 120 days of investment and that, at the very least, the investment would earn eight percent interest in a bank account. Furthermore, Valuck

---

[1]In fact, the IRS placed tax liens on another of Valuck's accounts.

told Roques that his previous investments in similar schemes had yielded successful results when, in fact, they had not. Significant to this appeal, however, is the investment of Susan Snow, a physician, and Richard Bratt, Snow's common law spouse, who was in charge of Snow's finances at the time.

Believing that Valuck, a physician with a high income, would not steer them in the wrong direction, and because Valuck assured Bratt that he had previously invested in such programs and that such investments were successful, Snow and Bratt invested $100,000 in his scheme. Convinced that such an investment was sound, Snow executed a written agreement with Valuck that called for a $100,000 investment to be made by wire transfer. Per the agreement, and in accordance with the wiring instructions furnished by Cleveland, Bratt sent a wire transmission to Muriel Seibert & Company in New York requesting that $100,000 be transferred to the Life Guard Services account at Citizens Bank. The funds ultimately reached the account on February 15, 1996. A summary of the funds going into the account reveals that Snow's investment was spent within two weeks of the wire transfer on personal and business expenses by Valuck, Cleveland, and others. It is this wire transfer that forms the basis of the wire fraud charged in Count Two of the indictment.

At trial, Cleveland testified that at the time of the Snow/Bratt wire transfer both he and Valuck were low on cash and they each took a draw out of the $100,000. Because Valuck was not a signatory to the account, he did not have direct access to the

3

funds. In order to gain access to the funds, Valuck told Cleveland to purchase cashier's checks with money withdrawn from the account. As a result, Valuck obtained $26,000 from the Life Guard Services account.

Special Agent Paul Geboski testified as to the actual disposition of the Snow/Bratt investment. Prior to the deposit of the $100,000, the Life Guard Services account had a balance of $200. The same day the deposit was made, five cashier's checks, totaling $25,000, were purchased using the newly acquired funds, and an additional $1,000 in cash was withdrawn from the account. In particular, a $10,000, a $5,000, and a $2,500 check were deposited in the Mid-County Teachers Credit Union Account of Sylvia Hargroder, Valuck's girlfriend. A $5,000 check was deposited in a joint account held by Valuck and Hargroder. The final check, in the amount of $2,500, was cashed by Valuck at Citizens Bank. Valuck readily admits that he negotiated the checks and eventually spent the money on personal expenses. The purchase and negotiation of these checks form the basis for the money laundering charge alleged in Count Five of the indictment.

On December 16, 1998, Valuck was charged in a five-count indictment. In particular, Valuck was charged with two counts of wire fraud, two counts of causing the transmission of money valued at $5,000 or more in interstate travel, and one count of money laundering. At trial, the government presented the testimony of Cleveland. During the presentation of this testimony, the

4

prosecution made numerous references to Cleveland's guilty plea in its opening statement, on direct examination of Cleveland, and during its closing argument. Notably, Valuck's trial counsel never objected to any of these references.

At the close of the government's case, Valuck made a motion for a judgment of acquittal. The motion was granted as to the substantive part of Count One (a wire fraud count) and denied as to the remaining counts. Valuck renewed this objection at the close of all of the evidence, and that motion was denied in all respects. The jury returned guilty verdicts on the four remaining counts charged in the indictment, and Valuck received sixty months' imprisonment for wire fraud, two seventy-month sentences for interstate transportation, and seventy months' imprisonment for money laundering, all to run concurrently, along with concurrent three-year supervised release terms on each count. Additionally, the district court ordered Valuck to pay restitution in the amount of $634,484.91, the total amount lost by various investors, and special assessments in the amount of $200. A timely notice of appeal was filed on December 14, 2000. We have jurisdiction in this case pursuant to 28 U.S.C. § 1291.

## II.

Our review of a jury's verdict is tempered with great deference toward the decision of the jury, and we must evaluate the evidence in the light most favorable to the jury verdict. United

5

States v. McCauley, 253 F.3d 815, 818 (5th Cir. 2001). A district court's denial of a motion for acquittal is reviewed de novo. United States v. De Leon, 170 F.3d 494, 496 (5th Cir. 1999).

When evaluating a challenge to the sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and we will uphold the verdict if a rational juror could have found each element of the charged offense beyond a reasonable doubt. McCauley, 253 F.3d at 818. Our review is de novo, and "[i]f 'the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' a defendant is entitled to a judgment of acquittal." United States v. Brown, 186 F.3d 661, 664 (5th Cir. 1999) (quoting United States v. Schuchmann, 84 F.3d 752, 754 (5th Cir. 1996)).

Valuck challenges the sufficiency of the evidence used to convict him of money laundering under 18 U.S.C. § 1956. That statute provides in pertinent part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-
>      (A)(i) with the intent to promote the carrying on of specified unlawful activity . . . [shall be guilty of money laundering].

18 U.S.C. § 1956(a)(1) (1994). To sustain a conviction under this section, the government must prove beyond a reasonable doubt that (1) the financial transaction in question involves the proceeds of

6

unlawful activity, (2) the defendant had knowledge that the property involved in the financial transaction represented proceeds of an unlawful activity, and (3) the financial transaction was conducted with the intent to promote the carrying on of a specified unlawful activity. United States v. Wilson, 249 F.3d 366, 377 (5th Cir. 2001). For our purposes, the Snow/Bratt transaction represents the unlawful activity, and the cashing of the checks represents the financial transaction.

As discussed above, Valuck does not appeal the sufficiency of the government's evidence as to Count Two of the indictment, charging him with wire fraud with respect to the Snow/Bratt transaction. Thus the first element of the offense is established. Also, Valuck does not contest the sufficiency of the government's evidence with respect to his knowledge about the illegality of using the cashier's checks, the funds for which were illegally obtained from the Snow/Bratt transaction. Thus the second element of the offense is established. Valuck does, however, challenge the sufficiency of the evidence regarding the third element of the offense.

Even though Valuck admits negotiating the cashier's checks in question, once when he received them from Cleveland and again when he deposited or cashed the checks, he contends that such negotiations cannot, as a matter of law, promote the antecedent wire fraud. In turn, Valuck argues that if we were to uphold his conviction for money laundering on the evidence before us, we would

essentially turn the money laundering statute into a "money spending" statute. See United States v. Olaniyi-Oke, 199 F.3d 767, 770 (5th Cir. 1999) (using proceeds solely for personal expenses will not sustain a money laundering conviction). Although intriguing, we do not find this argument persuasive. Instead, we agree with the government that the manner in which Valuck spent the ill-gotten money is irrelevant because it is the deposit of funds, not the subsequent expenditure of such funds, which is the transaction intended to promote the predecessor wire fraud.[2]

To start, we categorically reject any suggestion by Valuck that a financial transaction cannot promote a completed illegal activity for purposes of section 1956(a)(1)(A)(i). As we made clear in United States v. Cavalier, the cashing of an illegally obtained check can promote the completion of an underlying unlawful act. 17 F.3d 90, 93 (5th Cir. 1994); see, e.g., United States v.

---

[2]Count Five of the indictment states:

> On or about the 15th day of February, 1996, in the Eastern District of Texas and elsewhere, WILLIAM MARTIN VALUCK, Defendant herein, knowing that the money or funds involved in a financial transaction represented the proceeds of some form of unlawful activity, that being the wire fraud described in Count 2 of this indictment which is adopted herein, did knowingly conduct a financial transaction, with the intent to promote the carrying on of such specified unlawful activity, said financial transaction being the purchase and negotiation of $25,000 of cashier's checks from Citizens Bank of Texas, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(1) [sic].

(emphasis added).

8

Paramo, 998 F.2d 1212, 1218 (3d Cir. 1993) ("a defendant can engage in financial transactions that promote not only ongoing or future unlawful activity, but also prior unlawful activity"); United States v. Montoya, 945 F.2d 1068, 1076 (9th Cir. 1991) (same); But see, United States v. Jolivet, 224 F.3d 902, 909 (8th Cir. 2000) ("We find no logic in the government's suggestion that [defendant] could promote the carrying on of an already completed crime."). We now take this opportunity to reaffirm our position in Cavalier and we note further that this court subscribes to a broad interpretation of the word "promote" within the context of section 1956. Not only is our view consistent with that of other circuits, it is also in line with how the word is commonly understood within the legal community. See Black's Law Dictionary 1214 (6th ed. 1990) (to "promote" something is to "contribute to [its] growth, enlargement, or prosperity of; . . . to advance"). Here, Valuck's negotiation of the cashier's checks most certainly advanced the underlying wire fraud, in that it allowed Valuck to prosper from his wrongdoing by completing the antecedent wire fraud. Having said this, we now turn to the merits of Valuck's claim.

To satisfy the "promotion" element of a money laundering conviction, we require the government to show that a defendant conducted the financial transaction in question with the specific intent of promoting the specified unlawful activity. Brown, 186 F.3d at 670. In Brown, a case on which Valuck heavily relies, we reversed a defendant's convictions pursuant to section

9

1956(a)(1)(A)(i) where the defendant used the proceeds from an illegal activity to write checks for legitimate business expenditures. <u>Id.</u> In doing so, we stressed the importance of avoiding turning the "money laundering statute into a 'money spending statute.'" <u>Id.</u> (citing <u>United States v. Leonard</u>, 61 F.3d 1181, 1185 n.2 (5th Cir. 1995)); <u>see also</u> <u>United States v. Sanders</u>, 928 F.2d 940, 946 (10th Cir. 1991). Valuck contends that his case is factually indistinguishable from <u>Brown</u>. We, however, disagree.

In <u>Brown</u>, the government indicted the defendant on the basis of his "spending transactions," not on the receipt and subsequent depositing of illegal funds. 186 F.3d at 669 n.12. In this case, however, the government alleges that the "purchase and negotiation"[3] of the cashier's checks forms the basis for the money laundering charge. Based on this, by upholding Valuck's conviction for money laundering we are in no way converting section 1956 into a "money spending statute," as Valuck suggests, because we focus solely on the negotiation of the cashier's checks. In fact, other circuits have upheld similar "receipt and deposit" convictions.[4]

---

[3]The government alleges both the "purchase and negotiation" of the cashier's checks; however, it is important to note that Valuck did not actually purchase the cashier's checks. In actuality, Cleveland did so at the request of Valuck. Also, Valuck attempts to draw a distinction between "negotiation" and "deposit," as if the two can be distinguished in the banking context. In that context, however, no such distinction exists because in order to "deposit" a check into a bank account, one must first "negotiate" the check, i.e., transfer the check to the bank.

[4]Although we recognize that "receipt and deposit" prosecutions
(continued...)

For example, in Paramo, the Third Circuit upheld a defendant's conviction for money laundering where the defendant cashed embezzled checks from the IRS and then spent the ill-gotten gain on personal expenses. 998 F.2d at 1217-18. The court explained that because the defendant

> understood that the embezzled checks would have been worthless unless cashed at a bank or otherwise exchanged for negotiable currency . . . the jury rationally could have found that the cashing of each check contributed to the growth and prosperity of each preceding mail fraud by creating value out of an otherwise unremunerative enterprise.

Id. at 1218. As noted above, in Cavalier we endorsed this same approach. 17 F.3d at 93.[5] Applying this "receipt and deposit"

---

[4](...continued)
are "disfavored," Brown, 186 F.3d at 669 n.12, this fact does not alter the result we reach today. That is, simply because such prosecutions are disfavored has no bearing on whether we should sustain convictions based upon such prosecutions.

[5]We recognize a split among the circuits on this issue. Compare United States v. Haun, 90 F.3d 1096, 1100-01 (6th Cir. 1996) (upholding promotion conviction where evidence presented allowed a reasonable jury to infer that cashing of checks promoted "not only his prior unlawful activity, but also his ongoing and future unlawful activity"), United States v. Manarite, 44 F.3d 1407, 1416 (9th Cir. 1995) (upholding promotion conviction because chip-skimming scheme could not benefit its participants unless chips were cashed, rational jury could conclude chips were cashed with intent to promote the chip-skimming scheme), and United States v. Montoya, 945 F.2d 1068, 1076 (9th Cir. 1991) (upholding promotion conviction and noting that "depositing the check provided an opportunity for [defendant] to carry out the illegal bribery"), with United States v. Jolivet, 224 F.3d 902, 909 (8th Cir. 2000) (reversing promotion conviction because subsequent activity cannot "promote the carrying on of an already completed crime"), and United States v. Heaps, 39 F.3d 479, 486 (4th Cir. 1994) (expressly rejecting broad statutory interpretation employed by Third and Ninth Circuits as inconsistent with congressional intent). Cf.
(continued...)

11

approach to Valuck's case, we are left with the clear impression that his conviction must be upheld.

In this case, Valuck intentionally chose not to include his own name as a signatory on the Cleveland account so as to avoid the watchful eye of the IRS.  Consequently, Valuck did not have direct access to the illegally obtained funds that were deposited into the account.  Instead, Valuck's only access to the funds was through his co-conspirator, Cleveland, and the only way Valuck could prosper from this scheme was to receive the cashier's checks and then either deposit or cash the check, ultimately completing the underlying wire fraud.  Valuck chose to deposit $25,000.  Absent such deposits, the uncashed checks would have been worthless. Thus, a jury could have rationally concluded that the depositing of the checks promoted both the growth and prosperity of the antecedent wire fraud by generating "value out of an otherwise unremunerative enterprise."  Paramo, 998 F.2d at 1218.  While it is true that had Valuck's name been on the account in question, and he withdrew the money and spent the money for personal expenses, our decision in Brown would cast some serious doubt on the government's money laundering conviction.  This is not, however, the manner in which Valuck proceeded.  Here, the success of Valuck's wire fraud was predicated on the transfer of money from Cleveland to Valuck.

---

[5](...continued)
United States v. Calderon, 169 F.3d 718, 722 (11th Cir. 1999) (questioning whether the decisions of the Third, Sixth, and Ninth Circuits "were rightly decided," but not deciding the issue).

12

Therefore, it is the absence of Valuck's name on the account that helped promote the prior unlawful activity by allowing Valuck to avoid detection by the IRS. Therefore, we conclude that a rational jury could have found that Valuck's negotiation of the cashier's checks promoted the antecedent wire fraud, and that in negotiating the checks Valuck specifically intended to promote the already completed wire fraud.

## III.

Valuck contends that the government improperly introduced Cleveland's guilty plea as substantive evidence of Valuck's guilt. Because Valuck's trial counsel did not object to the introduction of this evidence at trial, our review is for plain error. United States v. Chung, 261 F.3d 536, 539 (5th Cir. 2001) (citing United States v. Calverley, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc)).

As a general rule, "[a] witness-accomplice guilty plea may be admitted into evidence if it serves a legitimate purpose and a proper limiting instruction is given." United States v. Marroquin, 885 F.2d 1240, 1247 (5th Cir. 1989). Here, the plea agreement was introduced into evidence with an adequate limiting instruction, which properly advised the jury. In particular, the district court instructed the jury that "[t]he fact that an accomplice has entered a plea of guilty to an offense charged is not evidence, in and of itself, of the guilt of any other person." Further, the district

13

court instructed the jury that such testimony should be "received with caution and weighed with great care."  We have, in the past, upheld nearly identical instructions to the ones given in this case.  See United States v. Abravaya, 616 F.2d 250, 251-52 (5th Cir. 1980).  Accordingly, based upon our examination of the district court's instructions, we are convinced that there was absolutely no error contained within the instruction, plain or otherwise.  Next we must determine whether the government's introduction of the guilty plea serves a proper purpose.

In support of its introduction of Cleveland's guilty plea, the government argues that the purpose of introducing the plea was to show that there was no unduly favorable deal between the government and Cleveland in exchange for his testimony, and to avoid the impeachment of Cleveland's testimony.  In United States v. Black, we noted the propriety of disclosing the nature of a plea agreement on direct examination, so as to ensure that the jury would not be left with the "impression that the government was not being fully candid," should the issue be raised first on cross-examination. 685 F.2d 132, 135 (5th. Cir. 1982); see also Marroquin, 885 F.2d at 1247 (introducing plea agreement to show that no "sweetheart deal" existed between government and witness served a proper purpose). Furthermore, we also have recognized that where the conviction of a co-conspirator may be used to impeach that co-conspirator's testimony, the prosecutor may introduce the plea in order "to 'blunt the sword' of anticipated impeachment by revealing the

14

information first." Marroquin, 885 F.2d at 1246. Here, the introduction of Cleveland's guilty plea served the dual purpose of reducing the potential effects of impeachment, while showing the jury that Cleveland had not been provided any "sweetheart deal" in exchange for his testimony.

At trial, the government referred to Cleveland's plea agreement in its opening statement, on direct examination of Cleveland, and in its closing statement. Surely, the government is permitted to outline its evidence during opening argument, and that, of course, includes evidence about an accomplice's guilty plea. United States v. Magee, 821 F.2d 234, 241 (5th Cir. 1987). With respect to the direct examination of Cleveland, Cleveland testified that he had pleaded guilty to wire fraud, completed almost two years in prison for that crime, was now on supervised release, and that in exchange for his testimony the court could, at most, reduce his term of supervised release by two years. This testimony showed that Cleveland and the government had not brokered any arrangement that might be conceived as conferring a great benefit on Cleveland in exchange for his testimony. Finally, in closing, the government referred to Valuck and Cleveland as "partners in crime" and noted that because Cleveland has "spent two years in prison, [his] testimony carries a great deal of credibility." Although these statements are somewhat overreaching, they are not, however, the "classic example" of an improper use of an accomplice's guilty plea in order to show the guilt of the

15

accused, as Valuck suggests. In light of the adequate jury instructions given by the trial court, and the proper purposes that were served in introducing Cleveland's testimony, we hold that the district court did not commit plain error by admitting evidence of Cleveland's guilty plea.

## IV.

Valuck argues that he was denied effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. Specifically, he alleges his trial counsel failed to (1) object to the introduction of his tax problems, (2) object to the introduction of Cleveland's guilty plea, (3) investigate the bases of opinions of Agent Geboski, (4) object to Geboski's testimony, (5) make an opening statement, and (6) object to the non-responsive answers of several government witnesses. As a general rule, Sixth Amendment claims of ineffective assistance of counsel should not be litigated on direct appeal, unless they were previously presented to the trial court. United States v. Delagarza-Villarreal, 141 F.3d 133, 141 (5th Cir. 1998). We do, in rare cases, grant an exception to this rule. Id. (quoting United States v. Navejar, 963 F.2d 732, 735 (5th Cir. 1992)). This, however, is not one of those rare cases. In fact, on the record before us, any determination as to the reasons for trial counsel's actions would be speculative in nature and this court does not decide issues on the basis of speculation alone. Accordingly, we decline to entertain Valuck's appeal on this ground, but we do so

16

without prejudice to Valuck's right to raise this issue collaterally in a habeas corpus proceeding. <u>Delagarza-Villarreal</u>, 141 F.3d at 141; <u>United States v. Higdon</u>, 832 F.2d 312, 314 (5th Cir. 1987).

**V.**

For the foregoing reasons, we AFFIRM.