**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 12, 2009

No. 07-10199

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

DEBORAH J SETSER; GREGORY EARL SETSER

Defendants-Appellants

---

Appeals from the United States District Court
for the Northern District of Texas

---

Before SMITH and SOUTHWICK, Circuit Judges, and RODRIGUEZ, District Judge.[*]

LESLIE H. SOUTHWICK, Circuit Judge:

Gregory Setser appeals his convictions, and Deborah Setser her sentence, on multiple counts stemming from a multi-million dollar Ponzi scheme. Finding no reversible error, we AFFIRM.

## FACTS

Gregory and Deborah Setser, who are siblings, were convicted of involvement in a Ponzi scheme focused on soliciting funds from Christian groups for largely mythical deals involving real estate and retail products. As in a

---

[*] District Judge of the Western District of Texas, sitting by designation.

classic Ponzi scheme, as new investments came in (eventually totaling $173 million), some of the new money was used to pay earlier investors. The take-home for the personal use of the Setsers and their co-conspirators was shown to be about $58 million.

Gregory Setser was in overall charge. He operated a company called IPIC. He told potential investors that IPIC's business model was to buy a wide variety of products cheaply overseas and resell them to retailers or governments at a profit. Deborah Setser's involvement was focused on an entity called the Home Recovery Network ("HRN"), which purported to deal in real estate. The scheme ground to a halt in November 2003, when IPIC was shut down and the Setsers were arrested. Investors suffered substantial losses.

At trial, the government presented evidence that the company did little legitimate business, buying only enough products to convince curious investors of the enterprise's legitimacy.

The SEC and FBI began parallel civil and criminal investigations of IPIC in August 2003. The SEC initiated a civil action against IPIC, HRN, and the Setsers on November 17, 2003. Alleged were violations of the securities laws. Appointment of a receiver to preserve the defendants' assets was requested. The district court appointed Dennis Roossien as receiver. He was granted the authority to "enter and secure any premises" of the defendants "in order to take possession, custody, or control" of their assets.

On November 6, eleven days before the civil suit was filed, a grand jury returned a sealed indictment against the Setsers and three other defendants. On November 18, the day after the filing of the civil suit, the indictment was unsealed and the defendants arrested. After the arrests, the receiver and his agents entered IPIC's offices and seized various assets. Many records were later turned over to law enforcement agents with the permission of the receiver.

The district court denied a motion to suppress this evidence. The Setsers argued that the receiver was acting as an agent of the FBI and IRS criminal investigators. Though there was no search warrant, the district court found that the receiver had seized only the documents covered by the Receivership Order. Properly having possession, the receiver could give documents to the FBI.

After a four-month jury trial, both defendants were convicted of one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; securities fraud, in violation of 15 U.S.C. §§ 77q(a) and 77x; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of Section 1956(a)(1)(A). Gregory Setser was also convicted of ten counts of substantive wire fraud, in violation of 18 U.S.C. § 1343; one count of substantive mail fraud, in violation of Section 1341; and five additional counts of money laundering. The jury acquitted Deborah Setser on the additional money laundering counts. The court granted both defendants judgments of acquittal with respect to two mail fraud counts.

Deborah Setser received a below-Guidelines range sentence of three 15-year terms and one 5-year term, to be served concurrently. Gregory Setser was sentenced to serve multiple concurrent 20-year terms, a consecutive 5-year term for the securities fraud count, and another consecutive 15-year term for one of the money laundering counts. His total was 40 years' imprisonment.

DISCUSSION

*I. Gregory Setser Issue – Receivership Order and Search*

When we review the denial of a motion to suppress, factual findings are examined for clear error; whether the law enforcement action was constitutional is considered *de novo*. *United States v. Stevens*, 487 F.3d 232, 238 (5th Cir. 2007). Evidence is viewed in the light most favorable to the prevailing party, which on this issue was the government. *Id.*

There are three parts to Setser's allegations of improper conduct with regard to the Receivership Order: (1) the Receivership Order failed to comply with the Fourth Amendment's particularity requirement, making it an impermissible general warrant; (2) the receiver nonetheless exceeded his authority by seizing documents "completely unrelated" to the purpose for which he was appointed; and (3) the receiver was late in posting his bond.

*A. Particularity Requirement*

Some Fourth Amendment protections apply to civil as well as criminal investigations. *See Franks v. Smith*, 717 F.2d 183, 186 (5th Cir. 1983). A search warrant is to describe the place to be searched and the things to be seized with "particularity." *United States v. Layne*, 43 F.3d 127, 132 (5th Cir. 1995). Setser views the Receivership Order as the equivalent of a warrant, to which the particularity requirement must be applied.

While Setser concedes that other cases have found, in his words, that "a receiver may conduct a warrantless search of a premises," he argues that such cases are inapplicable here. He argues that a 1987 Supreme Court decision altered the previous understanding of receiver searches. *See New York v. Burger*, 482 U.S. 691 (1987). In that case, the Supreme Court addressed the validity of a state regulatory scheme permitting warrantless inspections of automobile junkyards. The Court applied what it called an "established exception" to the requirement of warrants, which was for government inspectors to search closely regulated businesses in certain circumstances. *Id*. at 703. Required was "a constitutionally adequate substitute for a warrant," including giving the search a "properly defined scope" and "limit[ing] the discretion of the inspecting officers." *Id*.

Receivers are not like the *Burger* state inspectors. They, because of the nature of the regulated business, may be permitted on their own and without prior court approval to make broadly intrusive and unannounced inspections in

order to assure compliance with the state's rules. A receiver takes over property only after a court has agreed with the arguments and evidence that such a takeover is necessary. The *Burger* requirement of "a constitutionally adequate substitute for a warrant" in some circumstances therefore does not add anything new to the prior rules for receivers.

Two years before *Burger*, we held that a receiver, who has properly come into possession of property, may turn the property over to law enforcement officials without a warrant. *United States v. Gray*, 751 F.2d 733, 737 (5th Cir. 1985). We did not discuss in *Gray* the breadth of authority that may validly be given a receiver to seize property. Setser alleges there are limits, and among them is something akin to the requirement that a search warrant provide specific guidance on what is and what is not within the scope of permissible search and seizure. Setser acknowledges that no court has ever held that the equivalent of a warrant must be issued in order for a receiver to be permitted to seize the property of the subject entity.

One reason that particularity is not translatable to the receiver context is that once appointed, the receiver often takes possession of all property of the distressed or distrusted entity. That seizure of all assets on behalf of the court is a central purpose for the appointment of a receiver. The Setser Receivership Order was an exercise of that broad authority:

> This Court hereby takes exclusive jurisdiction and possession of the assets, monies, securities, claims in action, and properties, real and personal, tangible and intangible, of whatever kind and description, wherever situated, of Defendants and Relief Defendants ("Receivership Assets"), and the books and records of the Defendants and Relief Defendants ("Receivership Record").

Setser is challenging the breadth of the Receivership Order itself. We have found no statutory or judicially created limits of the nature Setser argues

exist to a receiver's right to seize assets. In fact, the statutory authority of a receiver appointed by the court is as broad as this receiver order:

> a trustee, receiver, or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959(b).

In conclusion, the receiver was authorized to seize all the named categories of assets and records of the identified defendants. Because the receiver was taking possession of everything in those categories that had been the property of the defendants for whom the receivership was authorized, further particularity would have served no purpose. After the seizure, the receiver had possession of the property only because he had been authorized by court order. We find no basis to support the argument that more was needed.

*B. Scope of Search Under the Receivership Order*

Setser next contends that even if the Receivership Order as written was valid, "the Receiver exceeded even the most expansive interpretation of the authority it granted by conducting a general, exploratory search and seizure of documents unrelated and inconsequential" to the receivership.

He argues that many of the documents and items taken by the receiver, particularly those from various residences, exceeded the scope of the receiver's mandate. Citing the SEC's complaint, Setser alleges the receiver could only "marshal, conserve, protect and hold funds and assets" of the defendants. In his view, the search went beyond the boundaries of a valid warrant and was presumptively unconstitutional. *E.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *Stanley v. Georgia*, 394 U.S. 557, 569 (1969). He quotes the

testimony of one agent who assisted in the search to argue that the searchers were "predisposed" towards including, rather than excluding, documents from the search, that some documents taken were "unrelated to the location or preservation of assets," and that documents were turned over to the FBI, in some cases, before anyone representing the receiver had viewed them at all.

As a remedy, Setser suggests the suppression of "all evidence" against him because the search was conducted in "flagrant disregard" of the Receivership Order. *See United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000). Recognizing that this circuit has not adopted the "flagrant disregard" standard, he argues in the alternative that the evidence that was actually outside the scope of the Receivership Order must be suppressed.

Setser does not identify the evidence that allegedly was seized outside the scope of the order and later admitted at trial. We do not rule in the abstract on questions of suppression. We must know what evidence was admitted in violation of some specifically identified right. *See United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005) (must "specifically delineate how the introduction of the evidence" affected the claim being made). Setser's response is that the scope of the receiver's seizures and the massive amount of evidence introduced at trial made identification of specific illegal evidence impossible. He seeks a remand for hearings to determine what evidence was illegally seized.

Setser alleges that the search led to "seizing photographs, business brochures, videotapes, [calendars], organizational charts, credit card bills, wedding invoices and letters of recommendation," and that search team members were instructed to retrieve information about "how the IPIC business was operated," putting the search beyond the parameters of simply preserving its assets. There apparently was a massive amount of evidence obtained and later introduced. Yet we find no support that the evidence was anything other than what the Receivership Order allowed to be seized, which in summary were

7

the "properties, real and personal, tangible and intangible," of the defendants and their businesses. That seizure was necessary in order that the businesses could be operated. Because of the manner in which these businesses had been operated, or at least as jurors became convinced they had been, seizure of relevant documents revealed substantial criminal activity.

At least at the level of practicality, we agree with Setser that it would have been difficult to address in a pretrial motion to suppress the significant quantity of evidence that was seized and likely would be introduced. Even in this post-trial appeal, though, we are satisfied that the evidence that convicted Setser was incriminating because it reflected the criminal manner in which the businesses were operated, which also means the evidence was the kind of records and other property that the receiver had the authority to seize. Absent any showing or meaningful suggestion of what evidence was introduced that might have been improperly acquired, we do not further pursue this issue.

## C. Delay in Posting the Receiver's Bond

Setser next argues that the receiver lacked authority to enter premises and seize documents because he did not post a required bond until after he had conducted the searches. *See* 28 U.S.C. § 754. The government does not dispute that a bond was not timely obtained.

Setser cites a district court case as his primary authority for this proposition. *Warfield v. Arpe*, No. 3:05-cv-1457-R, 2007 WL 549467, at *10-11 (N.D. Tex. Feb. 22, 2007). There, a receiver did not timely file his order of appointment in a different state, a filing that became necessary once some of the assets were found to be present there. A statute provides that the "failure to file such copies in any district shall divest the receiver of jurisdiction and control over all such property in that district." 28 U.S.C. § 754. In *Warfield*, the court upheld a new appointment and timely filing of the necessary papers to correct the defect. 2007 WL 549467, at *11.

The statute in question in *Warfield* also provides that "upon giving bond as required by the court," the receiver is vested with the control of the property and a right to take possession. 28 U.S.C. § 754. Setser does not dispute the government's claim that he never raised this issue at his criminal trial. Thus, we at most review for plain error. Even when there is error, the defect must "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Olano v. United States*, 507 U.S. 725, 732 (1993) (internal quotation marks omitted). We cannot find that the purely technical defect of the late but eventual obtaining of a bond in any way affects a substantial right, as no evidence was obtained and then introduced that could not later have been obtained and introduced after correcting the defect in the bond.

We therefore reject all of Setser's arguments that the search performed under the Receivership Order was invalid.

## II. Gregory Setser Issue – Conduct of Law Enforcement Officials

### A. Fourth Amendment Violation in Search of Property

Setser next argues that law enforcement officials violated his Fourth Amendment rights in their conduct after they took possession of records and assets from the receiver. He suggests that because the receiver lacked the authority to seize all the documents he took, law enforcement agents needed to obtain a warrant in order to review the information obtained from the receiver.

In our previously discussed *Gray* opinion, we found that a property owner "no longer had a reasonable expectation that those records would remain private" once a court has appointed a receiver, and the receiver has taken custody of records under the authority given him. *Gray*, 751 F.2d at 737. There is, in other words, no violation of the Fourth Amendment for a receiver who is the "lawful custodian" of the records to turn them over to law enforcement agents, at their request. *Id.*

Though *Gray*'s analysis is relatively brief, its logic is clear when read in conjunction with the statutes governing the appointment and conduct of receivers. A receiver is "vested with complete jurisdiction and control of all such [received] property with the right to take possession thereof." 28 U.S.C. § 754. A receiver "shall manage and operate the property in his possession . . . in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." *Id.* § 959(b).

Understanding the receiver's authority, we now examine what must be shown to establish a Fourth Amendment violation. A defendant must show that he had a "reasonable expectation of privacy" in the property searched. *United States v. Gomez*, 276 F.3d 694, 696-97 (5th Cir. 2001). The showing requires the defendant to prove (1) an "actual, subjective expectation of privacy," and (2) that the expectation is "one which society would recognize as reasonable." *United States v. Kye Soo Lee*, 898 F.2d 1034, 1037-38 (5th Cir. 1990). Because the first factor simply examines whether a defendant actually expected privacy, which is not difficult to assert, the dispositive factor is almost always the second one. This second factor, the reasonableness of a privacy expectation, can be viewed from several practical perspectives:

> whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.

*Gomez,* 276 F.3d at 697-98 (quoting *United States v. Haydel*, 649 F.2d 1152, 1155 (5th Cir. Unit A July 1981)).

We consider what occurred in the present case in terms of the list we just quoted from our precedents. Once the receiver took possession of the property, Setser's possessory rights were lost. Setser could neither exclude others from

the seized property nor take precautions to maintain the privacy of the property. After appointment, the receiver was "vested with complete jurisdiction and control" of the property and had the "right to take possession" of it. 28 U.S.C. § 754. The receiver was required to "manage and operate the property . . . in the same manner" as its original owner. *Id.* § 959. The receiver became the possessor, and as such could consent to the search of the seized documents. *E.g.*, *United States v. Brigham*, 382 F.3d 500, 512 (5th Cir. 2004) (en banc).

We also find justification for what occurred from the fact that a receiver is to be appointed only after a "prima facie showing of fraud and mismanagement." *SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 438 (5th Cir. Unit A May 1981). It would make little sense to hold that Setser continued to exercise veto power over the receiver's uses of his property when the purpose of the receivership was to preserve assets from fraudulent depletion.

We conclude that after a receiver validly takes possession of records and other property, becoming their "lawful custodian," the original owner has lost any "reasonable expectation that those records would remain private." *Gray*, 751 F.2d at 737. Accordingly, Setser's Fourth Amendment rights were not violated when the receiver turned over the property he seized from Setser to law enforcement officials.

### B. Unlawful Civil/Criminal Collusion

Setser would have us find that the government impermissibly mixed the receiver's civil investigation with the criminal case against him. The purpose, Setser argues, was to deprive him of the rights criminal defendants enjoy, while using more liberal civil discovery techniques to gain evidence for the criminal case. Setser argues that because the governmental "parties intentionally . . . orchestrated their actions and manipulated the administration of criminal justice in order to secure documents and papers to be used in the criminal

prosecution," the district court erred in refusing to suppress the evidence discovered in the receiver's search and then turned over to the FBI.

Setser asks this court to find that this behavior violated both the Fourth Amendment and his Fifth Amendment right to due process of law. He alleges that the proper remedy is either dismissal of the indictment or remand for a hearing on what evidence should have been suppressed.

Setser argues "that the Government may not bring a parallel civil proceeding and avail itself of civil discovery devices to obtain evidence for subsequent criminal prosecution." *United States v. Parrott*, 248 F. Supp. 196, 202 (D.D.C. 1965). The precedents on which he relies have a Supreme Court ruling as their source. *See United States v. Kordel*, 397 U.S. 1 (1970). We examine that original authority, then turn to the more recent authorities.

In *Kordel*, the Court distinguished its facts from five situations in which a finding of a constitutional due process violation might be made:

> We do not deal here with a case where [1] the Government has brought a civil action solely to obtain evidence for its criminal prosecution or [2] has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; [3] nor with a case where the defendant is without counsel or [4] reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor [5] with any other special circumstances that might suggest the unconstitutionality or even the impropriety of the criminal prosecution.

*Id*. at 11-12 (numbering added).

The precedents cited by Setser involved situations in which one or more of these *Kordel* situations existed. In one, the government coordinated a civil SEC investigation with a criminal investigation and deceived the defendants into believing there was no criminal investigation. *United States v. Stringer*, 408 F. Supp. 2d 1083, 1087-88 (D. Or. 2006), *rev'd*, 535 F.3d 929 (9th Cir.), *cert. denied*, 129 S. Ct. 658, *cert. denied*, 129 S. Ct. 662, *cert. denied*, 129 S. Ct. 663

(2008). The district court had dismissed the indictment after finding that the government impermissibly "develop[ed] a criminal investigation under the auspices of a civil investigation." *Id*. at 1089. After Setser filed his opening brief in this case, the Ninth Circuit disagreed and reversed. The court of appeals relied on the fact that "the SEC made no affirmative misrepresentations" to the defendants, disclosed the possibility of a criminal investigation on a form, and "engaged in no tricks to deceive defendants." *Stringer*, 535 F.3d at 940.

In the other principal case relied on by Setser, the trial court found that the government coordinated two investigations in a manner intended to mislead the defendants into believing there was no criminal investigation against them, including obtaining the defendants' depositions in the civil investigation with the intent to create evidence against them in the criminal case. *United States v. Scrushy*, 366 F. Supp. 2d 1134, 1138-39 (N.D. Ala. 2005). In the court's view, the government's overall coordination of the investigations, and especially its apparent arrangement of a deposition in the civil case to create a "perjury trap" for criminal prosecution purposes, while not informing the defendant that any criminal investigation was under way, was such an impermissible departure. *Id*. at 1139-40. Although the government did not "outright lie to" the defendant, it "manipulated" the "inescapably intertwined" investigations to an extent the district court found improper. *Id*.

A recent decision by this circuit refused to find impermissible commingling of civil procedures involved in an interview conducted for possible naturalization of an immigrant and criminal investigations into that immigrant's conduct. *United States v. Posada Carriles*, 541 F.3d 344, 356 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 1657 (2009). We restated the fundamental point "that the government may conduct simultaneous civil and criminal proceedings without violating the due process clause or otherwise departing from proper standards in administering justice." *Id*. at 354. Deception as to the purposes of the

13

investigation, or using otherwise meaningless civil proceedings as a pretext for acquiring evidence for a criminal prosecution, taking advantage of a person who does not have counsel, or other special circumstances may invalidate the prosecution. *Id.*

Setser can point to no "trickery" or cloaking of the criminal investigation as civil. Setser was not lured into any cooperation by the false premise that the investigation was purely civil. There is likewise no self-incrimination issue here, a common theme in the other cases. Ultimately, Setser's argument fails on the facts. He does not present evidence of strategic, intentional cooperation of the sort the district courts in *Stringer* and *Scrushy* found damning. For example, Setser claims that the governmental parties "had been cooperatively investigating and communicating . . . for months prior to the searches." But, as the government points out, his only record support for this assertion is a single phone call from an investigator from the Texas State Securities Board to an FBI agent assigned to the case. Setser does not provide evidence to contradict the government's assertion (and district court's conclusion) that the state investigator was herself "on the criminal side" of the probe.

Setser also points to the coordination inherent in the FBI's execution of arrest warrants at the same time as the receiver's agents were conducting their search of Setser's home and other premises. The government acknowledges that the two groups communicated in advance, but claims their cooperation was limited to logistical concerns such as ensuring the receiver did not interfere with the conduct of the arrests. Some of the search protocols for the receiver's team referred to the FBI as having some role in "terminating modem connections," and the receiver apparently permitted the FBI to review some documents before he himself reviewed them.

Setser made these points to the district court, which found that the FBI did not help formulate the search protocols. Whether or not the receiver read

documents before permitting the FBI to access them seems of little relevance, if he validly took possession of them pursuant to the Receivership Order.

Certainly the chain of events leading to the FBI's possession of the documents was helpful for the government. Still, we find no facts in the record to support a finding of clear error when the district court found no invalid cooperation between the civil and criminal investigations.

## III. Gregory Setser Issue – Evidentiary Rulings

### A. Evidence of Co-Conspirators' Guilty Pleas

Evidentiary rulings are reviewed for an abuse of discretion. *United States v. King*, 541 F.3d 1143, 1146 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 947 (2009). When, as here, the defendant did not object to admission of the evidence at trial, this court reviews only for plain error. *United States v. Valuck*, 286 F.3d 221, 228 (5th Cir. 2002).

Setser argues that the district court erred in allowing the prosecution to make various references to the guilty pleas entered by his co-conspirators, because the prosecution sought to use such evidence as "substantive evidence of guilt" and not for legitimate purposes. Setser particularly complains about other guilty pleas being mentioned at these times: during the government's opening statement; during the examination of Setser's daughter, Cassie Setser Schmidt; during the examination of an unindicted IPIC employee, Charmaine Sears; and, at greatest length, during the examination of Joshua Setser, Gregory Setser's son, who pled guilty to securities fraud.

While a guilty plea by a co-conspirator may not be used as evidence of guilt, it "'may be admitted into evidence if it serves a legitimate purpose and a proper limiting instruction is given.'" *Id.* (quoting *United States v. Marroquin*, 885 F.2d 1240, 1247 (5th Cir. 1989)). In "analyzing an admission of a co-conspirator's guilty plea," this court considers: "(1) presence or absence of a limiting instruction; (2) proper evidentiary purpose in introducing the guilty

plea; (3) improper use of the guilty plea as substantive evidence of the defendant's guilt; and (4) whether the introduction was invited by defense counsel." *United States v. Samak*, 7 F.3d 1196, 1198 (5th Cir. 1993). Preemptively introducing a plea to counteract anticipated defense efforts at impeachment is a proper purpose. *Valuck*, 286 F.3d at 228. A defense strategy that itself heavily relies on the guilty pleas with "frequent, pointed, and direct references," defeats subsequent attempts to claim error in the government's use of the pleas. *United States v. Leach*, 918 F.2d 464, 467 (5th Cir. 1990).

We apply these principles. First, the district court gave thorough limiting instructions that are similar to those approved by this court in *Valuck*. 286 F.3d at 228. As to the second and third factors, the government asserts that it was using the pleas for the permissible purpose of rebutting anticipated impeachment. The government does acknowledge that it "could be said to have placed undue weight on the guilty pleas" at "a few specific instances." While the lengthy questioning of Joshua Setser is justifiable, since Joshua Setser pled guilty and was testifying against his father, the government's much more limited references in the examinations of the two women are suspect, since those witnesses had not pled guilty. The government may have mentioned the pleas there in an attempt to make the witnesses' denials that they knew about criminal activity seem implausible. Nonetheless, the references were quite limited, so this factor weighs only slightly against the government.

The fourth factor, the defense's own use of the pleas, weighs against finding error. With respect to Joshua Setser, the record confirms that the defense devoted a significant portion of its cross-examination to the plea agreement, Setser called another witness and inquired about the details of his plea agreement, and the defense's closing argument suggested that plea agreements gave Joshua Setser an incentive to lie.

We find no reversible error.

16

## *B. Admission of Expert Testimony*

Decisions regarding the admission of testimony are reviewed for an abuse of discretion and are subject to harmless error analysis. *United States v. Griffin*, 324 F.3d 330, 347 (5th Cir. 2003). Under such an analysis, this court may not reverse unless "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *United States v. Hawley*, 516 F.3d 264, 268 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 994 (2009).

Setser argues that the district court improperly allowed the receiver to function as an "expert witness" by testifying that Setser's operations constituted "security fraud" and a "Ponzi scheme." Setser finds the testimony objectionable because it asserted legal conclusions, a practice barred by Federal Rule of Evidence 704(a).

The government concedes that allowing the "security fraud" statement was erroneous. Given the weight of the evidence against Setser, though, and the cautionary instructions given by the district judge, the government argues the error was harmless. The error was confined to, at most, "two lines" of testimony at the beginning of a four month trial. The judge gave instructions both specifically informing the jury not to draw inferences about Setser's state of mind from the receiver's testimony, and emphasizing that the jury was not bound by the receiver's conclusions and must undertake an independent evaluation of the evidence.

Setser argues that while the references may have been brief, the receiver's stature as a "central character in the collection and review of the evidence" gave him a status, in the eyes of the jury, above an ordinary expert witness. Accordingly, it would be reasonable to conclude that the jury gave inappropriate weight to the testimony. Setser also argues that the jury should have been specifically instructed that it could not use the testimony as evidence Setser committed securities fraud, rather than just not as probative of his state of mind.

We find that any error was harmless. Both cases cited by Setser on the issue conclude that the error was harmless based on the overwhelming weight of the incriminating evidence. *United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003); *United States v. Rich*, 145 F. App'x 486, 488 (5th Cir. 2005). The government's evidence against Setser was considerable, with numerous other witnesses whose testimony could independently have allowed the jury to convict. There is no reversible error with respect to this issue.

## C. *Evidence of Failure to File Income Tax Returns*

The standard for reviewing an alleged violation of Federal Rule of Evidence 403, which prohibits unfairly prejudicial testimony, is "especially high" and requires "a clear abuse of discretion" for reversal. *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007).

Setser objects to the admission of evidence regarding the failure of his enterprises to file federal income tax returns or pay taxes. He argues that because he was not charged with tax offenses, and the evidence was that the businesses had not filed tax returns even outside the period of time charged in the indictment, his tax compliance was not probative of whether he was engaged in fraud and served only a prejudicial purpose.

The district court granted Setser's motion to exclude evidence about his personal tax returns, but found that the government's theory that Setser had lied to investors about the existence of the corporate tax returns made that evidence "intrinsic" to the alleged conspiracy, and thus admissible. Intrinsic evidence is usually admissible in order to give a complete explanation of the crime. *Freeman*, 434 F.3d at 374 & n.2.

Setser quotes some testimony in which the failure to pay taxes was discussed in a more general way, with reference to both Setser personally and his corporations. On one such occasion, the district court interrupted the line of questioning. The government then returned to the previously approved use of

the corporate tax returns to illustrate fraud. Other occasions did not concern the filing of tax returns per se, but statements made by Setser to others bragging about the low amount of taxes he paid.

Setser must show that the probative value of the challenged evidence was "substantially outweighed by the danger of unfair prejudice" before its admission will be error. Fed. R. Evid. 403. Setser offers no meaningful response to the trial court's conclusion that the corporate tax return evidence was intrinsic to the conspiracy. That was because it showed he lied to potential investors to gain their confidence. His main complaint seems directed at the scattered references to his personal taxes. Those references largely were accounts of what Setser had told potential investors or employees about the tax benefits he enjoyed. Thus, that evidence could also be characterized as intrinsic to the conspiracies charged against Setser. In addition, the district court gave instructions that Setser was not charged with any tax crimes and, as noted, the court barred the admission of Setser's personal tax records.

Because the tax evidence was intrinsic to the offenses charged, and not introduced simply to prejudice Setser by implying he committed uncharged offenses, the district court did not err in admitting it.

## IV. *Deborah Setser's Sentence*

The one alleged error by Deborah Setser concerns her sentence. She argues that the district court erred in calculating the amount of loss attributable to her, determining the length of time she was part of the conspiracy,[2] and determining that the losses attributed to her were reasonably foreseeable even for those time periods during which she was part of the conspiracy. *See* U.S.S.G.

---

[2] This argument is asserted once, but there is no elaboration. The government argued, and the district court found, that Deborah Setser was part of the conspiracy from September 2002 to November 2003. She apparently argued at sentencing that she was part of the conspiracy only from February 2003 to September 2003. Her brief presents no argument in support of this issue, so we address only the amount of loss.

19

§ 1B1.3 cmt. 2 (elaborating on "reasonably foreseeable" standard); *United States v. Carreon*, 11 F.3d 1225 (5th Cir. 1994). Calculation of the loss amount and other factual determinations are reviewed for clear error; legal questions about the interpretation of the Guidelines are reviewed *de novo*. *United States v. Tedder*, 81 F.3d 549, 550 (5th Cir. 1996).

The question at the core of the loss-calculation dispute is whether it was appropriate to consider as new losses the funds from existing investors that were reported or returned to them as profits and then reinvested in the scheme. For those situations in which the original investments occurred before Deborah Setser's involvement, but the reinvestments occurred during her involvement, the effect of including the reinvestments was to increase the loss amount and number of victims attributed to her. Using this methodology, with credit given for money returned to original investors (but not "profits" received by investors), the district court concluded that the loss amount attributable to Setser was $61,601,032.

The principal issue presented concerns the present applicability of one of our precedents. *See United States v. Deavours*, 219 F.3d 400, 403 (5th Cir. 2000). There, this court had addressed the issue of loss calculation in a Ponzi scheme. We concluded that no credit should be given for money returned to investors, because money in a Ponzi scheme is returned "not to compensate the victims for their losses," but "to extend [the defendants'] criminal activities and the profitability thereof" by prolonging the life of the scheme. *Id.* In fact, repayment of invested funds in a Ponzi scheme serves to "increase the total returns from [the] criminal activity, and endanger yet more victims." *Id.* at 404.

Though *Deavours* has the effect of increasing the responsibility for losses on long-term conspirators, Deborah Sester argues that its reasoning prevents a late-arriving conspirator from being made responsible for losses that occurred from money invested before joining the scheme. Just as a defendant cannot

receive credit for returning money to an investor, she cannot be subject to "double counting" when an investor chooses to reinvest profits in the scheme.

The government argues that *Deavours* has been superseded by a 2001 amendment to the sentencing guidelines. S*ee* U.S.S.G. § 2B1.1 cmt. 3(E)(i) (explaining that "[l]oss shall be reduced by the . . . money returned . . . by the defendant, to the victim before the offense was detected"); U.S.S.G., 2002 Supp. to App'x C, amend. 617, at 184-85 (effective Nov. 1, 2001). In its explanation of the change to the application note, the Sentencing Commission contrasted *Deavours* with cases from other circuits that had permitted offsetting of payments to investors up to the amount they had invested. It stated explicitly that the "amendment adopt[ed] the approach of the Eleventh Circuit" in order to "resolve[] a circuit split." Supp. to App'x C at 184-85.

While no precedent has discussed the effect of the 2001 amendment on *Deavours*, we hold that *Deavours* has been superseded. Therefore, the district court's method of loss calculation was correct. Deborah Setser was given credit for money that was returned to investors, but such credits were offset when the money was reinvested into the scheme. Because it treated such reinvested money as new losses, this had the effect of increasing the amount for which she was responsible. Indeed, the scheme had such rapid investment turnaround that Setser was, under this approach, liable for the entirety of the losses attributed to the conspiracy. Net losses were suffered only by those investors who remained in the scheme at the time of its fall in 2003.

Under this loss calculation method, it also was reasonable to conclude that investors became "victims" again when they reinvested, thus explaining the district court's conclusion about the number of victims for whom Deborah Setser was responsible. In one case that Setser cites to us, we held that the defendant could not be held responsible at sentencing for acts of child sexual abuse perpetuated before his involvement in a conspiracy, when he had been convicted

only of distributing videotapes recording the sexual abuse. *United States v. Reinhart*, 357 F.3d 521, 527-28 (5th Cir. 2004). The underlying offense had been entirely completed before the defendant became involved in the conspiracy, and thus he could not have reasonably foreseen them in a "prospective only" sense. *Id.* at 528. But here, the rationale for counting the victims a second time is that a new offense occurred when the investors' money was plowed back into the conspiracy, justifying the different outcome.

Setser's ability to foresee the losses is the critical point. While she quotes the district court's observation that she had less involvement than did her brother Gregory Setser, she makes no meaningful argument of error in the district court's ultimate conclusion that she could have reasonably foreseen the losses caused by the conspiracy during the time of her participation. While Deborah Setser was primarily involved in the HRN real estate fraud, the government introduced evidence that she had involvement in IPIC operations.

Deborah Setser also raises an "as applied" Sixth Amendment challenge to the district court's calculation of loss amount and number of victims at her sentencing, and a Fifth Amendment challenge with regard to acquitted conduct for which she claims she was held responsible at sentencing. It is settled in this circuit that a "sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guidelines sentencing range." *United States v. Lewis*, 476 F.3d 369, 389 (5th Cir. 2007). Setser was sentenced well below both the statutory maximum range (65 years) and the guidelines range (life) for her offenses. The case law does not support a Sixth Amendment challenge in such circumstances. Her Fifth Amendment argument is also foreclosed by circuit precedent. *United States v. Pineiro*, 470 F.3d 200, 206 (5th Cir. 2006).

The convictions and sentences of both defendants are AFFIRMED.