# United States Court of Appeals
# for the Fifth Circuit

———————

No. 22-10584

———————

United States Court of Appeals
Fifth Circuit

**FILED**

February 28, 2024

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ALFREDO NAVARRO HINOJOSA; MIGUEL CASAS; MARTIN SALVADOR RODRIGUEZ,

*Defendants—Appellants*.

———————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:16-CR-536-9

———————————————————

Before JONES, BARKSDALE, and ELROD, *Circuit Judges*.

PER CURIAM:[*]

After a jury convicted the defendants of a variety of crimes related to drug sales that occurred in one of the defendant's nightclubs, the defendants challenged their convictions and sentences. Because there was extensive evidence in support of each, the defendants' convictions and sentences are AFFIRMED.

———————————————

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 22-10584

I

Alfredo Navarro Hinojosa owns several nightclubs in Dallas and Fort Worth, Texas. Miguel "Mike" Casas and Martin "Chava" Salvador Rodriguez were two of his most trusted managers and advisors. Hinojosa, Casas, and Rodriguez, along with other co-defendants not involved in this appeal, were charged as part of a thirty-three-count indictment related to third-party drug sales that occurred at Hinojosa's clubs between 2009 and 2016. The drugs sales, which occurred in the bathrooms of the clubs, typically consisted of $20 in exchange for a small bag of cocaine for personal use.

The dispute at trial centered around: (1) whether the defendants passively acquiesced to the drug sales occurring in the bathrooms of the clubs or actively allowed those sales; and (2) when the defendants learned that the drug sales were occurring. The evidence presented consisted of statements made by the defendants to the FBI, testimony from club employees and drug dealers, wiretaps and recordings of conversations between club management, and testimony about controlled buys conducted by federal agents.

Evidence was presented indicating that Hinojosa, Casas, and Rodriguez knew about the drug sales for all or most of the period during which the sales occurred. Evidence also showed that the defendants stopped allowing drug sales after the FBI raided the clubs but resumed allowing sales several months later because prohibiting sales hurt attendance and revenue. The defendants presented evidence indicating that the drug dealing did not occur with management's knowledge or approval.

The trial also included testimony from Deputy Easterling, who testified about the 2017 arrest of Josephine Hinojosa—Alfredo Hinojosa's

2

niece—and Eric Lee, an expert witness who testified about Hinojosa's business records and noted numerous red flags indicating that Hinojosa was probably engaged in money laundering.

After a seventeen-day trial, Hinojosa, Casas, and Rodriguez were each convicted on three counts: making a premises available for drug sales (Count 19); conspiracy to make a premises available for drug sales (Count 20); and conspiracy to possess with intent to distribute cocaine (Count 25). The jury also found that the defendants knew or should have known that the conspiracy involved at least five kilograms of cocaine. *See United States v. Staggers*, 961 F.3d 745, 762 (5th Cir. 2020). The jury did not reach a verdict on the remaining counts.

The district court sentenced Hinojosa to 192 months, Casas to 168 months, and Rodriguez to 150 months. Hinojosa was sentenced within his guideline range. Casas received a perjury enhancement and was sentenced below his guideline range because the district court determined that he was less culpable than Hinojosa and should receive a shorter sentence. Rodriguez was sentenced within his guideline range and received a lower sentence than Casas based on his relative culpability.

Hinojosa, Casas, and Rodriguez challenge the admission of certain evidence against them, the sufficiency of evidence as to their convictions, and the district court's application of the sentencing guidelines.

II

A

Defendants collectively challenge four aspects of their trial: (1) They each challenge the admission of testimony regarding Josephine Hinojosa's arrest; (2) Casas and Rodriguez challenge the admission of Alfredo Hinojosa's redacted statement; (3) Casas challenges the admission of Eric

Lee's testimony about money laundering; and (4) Hinojosa claims that his trial counsel was ineffective.

Evidence is relevant if "it has any tendency to make a fact [material to determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant evidence is generally admissible unless "its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Fed. R. Evid. 402, 403.

Evidentiary rulings are reviewed for abuse of discretion if the argument was preserved and plain error if not preserved. *United States v. Nutall*, 180 F.3d 182, 189 (5th Cir. 1999) (discussing the standard for relevance); *United States v. Setser*, 568 F.3d 482, 495 (5th Cir. 2009) (discussing the standard for prejudice); *United States v. Lewis*, 796 F.3d 543, 546 (5th Cir. 2015) (discussing plain error). An argument not raised before the district court, even if challenging an evidentiary ruling that was objected to before the district court, is not preserved. *Lewis*, 796 F.3d at 546. Plain error requires showing that: (1) the district court clearly or obviously erred in a way that affected the defendant's substantial rights; and (2) the court should correct the error because it seriously affects the integrity of judicial proceedings. *See id.*

An error, even on the abuse-of-discretion standard, is harmless if it cannot reasonably be taken to have affected the jury's decision. *Nutall*, 180 F.3d at 189 (citations omitted); *see also Kotteakos v. United States*, 328 U.S. 750, 764 (1946). Put another way, we will not overturn a jury verdict when aside from the improperly admitted evidence, there is otherwise ample evidence from which the jury could have convicted the defendant. *See United States v. Perry*, 35 F.4th 293, 334 (5th Cir. 2022).

1

Hinojosa, Casas, and Rodriguez each challenge the admission of testimony regarding the arrest of Josephine Hinojosa, Hinojosa's niece.[1] Josephine was arrested in 2017 while traveling from Texas to North Carolina with fourteen kilograms of cocaine and a computer drive containing business records related to the clubs. The defendants argue that the error was not harmless and their convictions on all three counts should be reversed. Hinojosa's challenge is reviewed under abuse of discretion. The parties dispute whether Casas and Rodriguez preserved this argument.

We need not resolve the disputed standard of review or evaluate whether admission of the Josephine testimony was proper because any error on either standard of review was harmless. An erroneous evidentiary ruling is harmless unless there is a reasonable probability that the improperly admitted evidence contributed to the conviction. *United States v. Lewis*, 774 F.3d 837, 844 (5th Cir. 2014) (finding harmless error on an abuse of discretion standard).

Here, there was extensive evidence supporting each of the convictions and the findings that Hinojosa, Casas, and Rodriguez claim were tainted by the Josephine testimony. *See United States v. Williams*, 620 F.3d 483, 493 (5th Cir. 2010) (finding any potential Rule 403 error harmless because of the substantial evidence against the defendant). Based on that

---

[1] The government claims that because relevance and prejudice are fact-specific inquiries, Casas and Rodriguez cannot adopt Hinojosa's arguments about Josephine. Accordingly, the government argues, their claims fail for inadequate briefing. We disagree. Hinojosa's brief discusses the lack of connection between Josephine's trip and the clubs and the inherently prejudicial nature of the quantity of drugs involved in her arrest. Because the argument does not rely on information specific to Hinojosa, it can be adopted by Casas and Rodriguez.

evidence, there is not a reasonable probability that the testimony about Josephine contributed to any of the jury's determinations.

The Counts 19 and 20 charges for making a premises available for drugs and conspiracy to do the same turn on whether the defendants knew and actively allowed the drug sales. Several employees and drug dealers testified that the drug sales were conspicuous and ubiquitous as early as 2013. Humberto Novoa, one of Hinojosa's most trusted advisors, testified that sales were occurring as early as 2013. He explained that "all of us knew" and referenced Casas and Rodriguez by name. Erick Lopez, a security guard at OK Corral Fort Worth from 2009 to 2014, testified that drug sales were conspicuous and ubiquitous when he worked at the clubs. Juan Julio Rodriguez, who was the head of security at Far West and OK Corral Dallas from 2013 to 2016, testified that drug sales consistently occurred while he worked at the clubs. He also testified that he told Casas and Rodriguez about the sales. Luis Rendon, a bouncer at the nightclubs, testified that he reported the drug sales to Casas and another manager reported them to Rodriguez in 2013 or 2014. Juan Lara, known as Negro or El Negro, who oversaw most of the drug dealers who sold at the clubs, testified that drugs were sold at the clubs from 2012 to 2015. At a minimum, because Hinojosa, Casas, and Rodriguez were known as hands-on managers,[2] the jury could infer from how prevalent and conspicuous the sales were that each of the defendants knew about the sales. The ubiquity of the drug sales is further supported by the nineteen controlled buys conducted by federal agents between 2013 and 2016. The timing of each defendant's knowledge is discussed in detail below.

_____

[2] There was testimony that Casas and Rodriguez were two of the few people whom Hinojosa trusted, that they were two of the top five decision-makers for the clubs, and that they had the authority to direct employees and make decisions for the club.

There is also evidence that each defendant approved of the sales. Hinojosa instructed Casas to occasionally clean up drug activity but otherwise be more accommodating. This instruction was a response to customer complaints about the lack of drugs, which were relayed to Hinojosa by Rodriguez. Casas and Rodriguez both advocated for allowing drug sales because customers complained to them when sales were prohibited.

There was also testimony about a meeting during which Casas explained that management decided to resume allowing drug sales because lack of drug sales was bad for business. Rodriguez made similar statements at a different meeting. There was evidence that Casas instructed a security guard to keep a payment that the security guard received from a drug dealer, that Rodriguez personally observed a drug deal in the bathroom in 2014, and that Hinojosa instructed a security guard to allow certain drug dealers to sell in the bathrooms. In other words, through their own statements and actions, all three defendants demonstrated their knowledge and approval of the sales.

The idea that the defendants actively facilitated the sales, rather than passively and reluctantly accepted them, is bolstered by their recognition that the drug sales were crucial to club attendance and revenue. Hinojosa admitted that he allowed drug sales to occur because preventing them was bad for business. He was recorded saying, "[w]e can't really clean [the drug sales] because then we lose business." Hinojosa specifically explained his plan to allow discreet sales so as not to attract too much attention.

Casas and Rodriguez also recognized the importance of the sales to the business. Novoa testified that management decided to resume allowing drug sales as long as they were discreet. He also testified that when the decision to resume allowing drug sales was made, Casas and Rodriguez

"were the ones telling Mr. Hinojosa that we should allow [drug sales in the bathrooms] to happen." During a recorded phone call between Hinojosa and his head of security, Eddie Villareal, Hinojosa stated that Rodriguez complained to him that the clubs were being too hard on drugs sales and Hinojosa told Villareal that he ordered Casas to be "more flex" about the drug sales.

To be sure, there is also evidence suggesting that the defendants opposed the sales to the extent that they were aware of them. Lara testified that he sometimes bribed security guards to remove rival drug dealers. He also testified that he never interacted with management and believed management was unaware that the sales were occurring. A security guard testified to bringing drugs into the club for a drug dealer so that the drugs would not be detected by security. A drug dealer also told an FBI agent that he was warned not to let Casas see him selling drugs. Casas texted a security guard to "stay on those bathrooms," but the security guard interpreted that to mean he should make sure that drug sales were not conspicuous. There is also a conversation in which Hinojosa states that he would rather have lower attendance than risk losing his club. Ali Valdez, who managed one of the clubs, testified that the clubs had a zero-tolerance policy for drug sales.

Much of this contrary evidence is consistent with the jury's determinations. The bribes were not to get the security guards to ignore prohibited selling but to remove competition. The fact that security guards were used to bring drugs into the clubs is consistent with the defendants' stated desire that sales be discreet. And the statements by Hinojosa and Valdez lack credibility in light of the evidence that drug sales occurred, including after the FBI raid. Given the extensive inculpatory evidence, this contrary evidence does not establish a reasonable probability that the testimony about Josephine contributed to the defendants' convictions.

Hinojosa contends that the jury's inability to reach a verdict on sixteen out of the seventeen charges for maintaining a drug premises means we cannot determine whether the testimony about Josephine influenced the jury's decisions on Counts 19 and 20. But the Supreme Court has rejected attempts to use failure to reach a verdict as evidence of the jury's views on other issues. *Yeager v. United States*, 557 U.S. 110, 124–25 (2009). In *Yeager*, the Supreme Court considered whether the jury's inability to reach a verdict on some counts proved it acted irrationally by acquitting on another count. *Id.* The Supreme Court explained that "the fact that a jury hangs is evidence of nothing," *id.* at 125, because "[t]o ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room." *Id.* at 121. So too here. To determine that the testimony about Josephine was probably a factor in the Counts 19 and 20 convictions because the jury hung on other counts would be to assume that the jury hung on those other counts for a reason that the Josephine testimony addressed.

The Count 25 charge for conspiracy to possess with intent to distribute turns on whether there was sufficient evidence from which the jury could have inferred an agreement between the defendants and the drug dealers. *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017) (listing elements of conspiracy). There was a variety of evidence from which the jury could have inferred a tacit agreement. *Id.* (explaining that tacit agreement is sufficient and can be "proved with circumstantial evidence" or "inferred from concert of action"). There was evidence that management allowed certain drug dealers to sell in the bathrooms, while rival drug dealers were removed. A drug dealer testified that Juan Lara, who oversaw most of the drug dealers who sold in the clubs, received permission from Hinojosa to resume sales in the clubs. Another drug dealer

testified that his supervisor received permission from Rodriguez to sell drugs in the bathrooms.

The defendants shared the same purpose as the drug dealers and benefitted from their success. And as the crackdown following the FBI raid and subsequent return to drug sales demonstrates, the defendants and drug dealers were coordinated about when sales could and could not occur. This evidence of coordination and shared purpose strongly supports an inference that the defendants and drug dealers had a tacit agreement to sell drugs.

The defendants each argue that they cannot be liable under Count 25 because knowledge, approval, or acquiescence in the purpose of the conspiracy is insufficient to establish participation. *United States v. Chandler*, 586 F.2d 593, 602 (5th Cir. 1978) (citing *United States v. Falcone*, 311 U.S. 205 (1940)). In *Chandler*, we held that evidence that an officer was present when deliveries of stolen gasoline were made was insufficient to sustain a conspiracy conviction because the evidence did not establish participation. *Id.* at 601–02. By influencing when and how the drug sales occurred, the defendants did more than just know about or approve of them. They participated. And because the defendants benefitted from the sales and decided to resume the sales after temporarily stopping them, they did more than merely acquiesce to something that they wished was not happening. We cannot hold that there was a reasonable probability that the testimony about Josephine contributed to the Count 25 convictions.

The drug quantity finding turns on when the defendants knew the drug sales were occurring.[3] The defendants contend that the evidence

---

[3] The PSRs, which the district court adopted, calculated the drug quantity by multiplying the number of weeks attributable to each defendant by an estimated 50 grams sold per week. Therefore, the sufficiency of the evidence for the quantity finding turns on the sufficiency of the evidence for the weeks attributed to each defendant.

recounted above only shows that they knew about and allowed the drug sales starting in 2014. The defendants ignore two ways in which the jury could have determined that the defendants knew about and were liable for drug sales occurring before 2014. First, the defendants rely on testimony from Juan Julio Rodriguez, in which he stated that Hinojosa told him to continue allowing sales in the clubs, a few months after the OK Corral Dallas club opened in 2014. But the OK Corral Dallas club opened in 2013. If the jury believed that Juan Julio correctly remembered that the conversation occurred a few months after the club opened and misremembered the year, they could have viewed the defendants' evidence as supporting participation in the conspiracy in 2013.

The jury also could have determined that the defendants knew about drug sales as early as 2013 based on the fact that Hinojosa told Juan Julio to *continue* allowing drug sales. That testimony does not suggest Hinojosa was surprised or learning for the first time that drug deals were happening. The statement that the sales were necessary strongly implies, though does not prove, that Hinojosa had experience with drug sales in his clubs for long enough to know the impact that they had on revenue. In other words, the conversation is evidence of participation well before the date when the conversation occurred. Given that knowledge even one year earlier than when Hinojosa admits to knowing drug sales were occurring would be sufficient to establish a quantity triggering the mandatory minimum, there was sufficient evidence for a rational juror to find that the conspiracy involved at least five kilograms on either standard of review. And that reasoning applies equally to Casas and Rodriguez given that management met every week and Casas and Rodriguez were deeply involved in running the clubs.

The evidence of ubiquitous and conspicuous drug sales starting well before 2014 also supports the drug quantity finding. The defendants were

very engaged in running the nightclubs. With the exception of the months immediately following the FBI raids when they were concerned about a federal investigation, the defendants were consistent in (1) acknowledging the importance of the drug sales to the business and (2) permitting drug sales provided that they were discreet. The jury may simply have inferred that this attitude and approach to the drug sales occurred prior to 2014.

Just three days after the FBI arrested a number of drug dealers at each of the three clubs, Hinojosa was recorded saying that "customers complain" and "we lose business" when "I get really tough in the bathrooms." This conversation is crucial because it occurred in March 2015 before the defendants decided in April 2015 to curtail drug sales out of fear that they were being investigated. It demonstrates that the defendants did not learn that drug sales were important to their business during the post-raid shut down. That contention, if true, would lend credence to the argument that the defendants were not responsible for sales that occurred before 2015. But the fact that Hinojosa already knew that drug sales were important to the business greatly undermines that argument. And the fact that Hinojosa knew is strong evidence that Casas and Rodriguez knew as well. Casas and Rodriguez were Hinojosa's most trusted advisors. They met every week.

We cannot say that there was a reasonable probability that the testimony about Josephine contributed to the drug quantity finding.

2

Casas and Rodriguez challenge the admission of a redacted statement that Hinojosa made to the government on the ground that it violates the Sixth Amendment. A defendant's Sixth Amendment right to confront witnesses against him is violated when: (1) "several co-defendants are tried jointly"; (2) "one defendant's extra-judicial statement is used to

implicate another defendant"; and (3) "the confessor does not take the stand." *United States v. Restrepo*, 994 F.2d 173, 186 (5th Cir. 1993) (citing *Bruton v. United States*, 391 U.S. 123, 127 (1968)).

Here, a redacted portion of Hinojosa's confession was admitted during trial.[4]  The admitted statement was:

> Question: And so who is the one bringing you these complaints about the drugs.
>
> Hinojosa: It could be the manager, it could be the promotion's guy . . . Because that's—that's the first people to hear the complaints.

The Supreme Court recently reaffirmed that confessions that directly implicate a co-defendant fall within *Bruton*, while those that do so indirectly do not. *Samia v. United States*, 599 U.S. 635, 647 (2023).  The fact that an inference is required does not necessarily mean implication is indirect. *Id.* at 652 (citing *Gray v. Maryland*, 523 U.S. 185, 195 (1998)) (explaining that admissibility must depend on the *kind* of inference because use of descriptions like "the red-haired, bearded, one-eyed man-with-a-limp" surely fall within *Bruton*).  Direct implication can occur when a statement is redacted to remove a defendant's name, yet still obviously refers to the defendant. *Id.* at 653 (citing *Gray*, 523 U.S. at 196 (explaining that the blanks would cause the jurors to speculate as to whom the blanks refer)).  By contrast, if a redacted statement only implicates the co-defendant in conjunction with other evidence, there is no Confrontation Clause violation. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987).

We need not determine whether a *Bruton* violation occurred because it is well established that a *Bruton* violation may be considered harmless

---

[4] At one point, Hinojosa decided to plead guilty and made admissions to the government.  He later decided not to plead guilty.

where, as here, disregarding the co-defendant's confession, there is otherwise ample evidence against the defendant. *United States v. Powell*, 732 F.3d 361, 379 (5th Cir. 2013) (explaining that a *Bruton* violation does not mandate reversal).

As recounted above, there was extensive evidence indicating that Casas and Rodriguez knew about and supported the drug sales. Novoa testified that when the decision to resume allowing drug sales was made, Casas and Rodriguez "were the ones telling Mr. Hinojosa that we should allow [drug sales in the bathrooms] to happen." During a recorded phone call between Hinojosa and his head of security, Eddie Villareal, Hinojosa stated that Rodriguez complained to him that the clubs were being too hard on drug sales and told Villareal that he ordered Casas to be "more flex" about the drug sales. Compared to this evidence, Hinojosa's statement that "the manager" and "the promotion's guy" told him about customer complaints was cumulative, and its admission, even if error, was harmless.

3

Casas also challenges the admission of testimony by Eric Lee, an expert witness who testified about Hinojosa's business records and noted numerous red flags indicating that Hinojosa was probably using the clubs for money laundering. Casas argues that Lee's testimony was irrelevant and prejudicial. Specifically, Casas argues that though the indictment lacked any money laundering claims, Lee testified extensively that the clubs served a money laundering function, prejudicing the defendants by making them look like money launderers for drug cartels.[5] Casas claims Count 21, which

---

[5] Count 21 charged Hinojosa and other defendants who are not part of this appeal with conspiracy to structure transactions to evade reporting requirements. Unlike money laundering, structuring transactions to evade reporting requirements does not require

charged Hinojosa and Novoa with conspiracy to structure transactions to evade reporting requirements, was improperly used to justify the admission of Lee's testimony.[6]

The testimony was relevant because it provided another plausible motive for allowing the drug sales: if attendance and revenue at the clubs decreased, it would be more difficult to hide the money being laundered through the clubs. In other words, lack of cash flow was not just a threat to business, it risked exposing an illegal money laundering scheme.

Nor was the testimony prejudicial. Lee's testimony was a technical analysis of business records, defense counsel repeatedly told the jury that there was no money laundering charge, and the jury instructions cautioned the jury not to consider charges not contained in the indictment. And any prejudice did not outweigh the probative value of the testimony. The central dispute for Counts 19, 20, and 25 was the defendants' level of involvement in the drug sales occurring at the clubs. Evidence that the defendants had a strong motive for allowing the sales made the defendants' argument that they reluctantly acquiesced to the sales less probable.

4

Hinojosa claims that his trial counsel provided ineffective assistance of counsel by advising him to withdraw his plea agreement based on a legal strategy that was directly in conflict with *United States v. Chen*, 913 F.2d 183, 190 (5th Cir. 1990). Specifically, Hinojosa moved for judgment of

---

showing that the proceeds involved came from an illegal activity. *Compare* 18 U.S.C. § 1956 *with* 31 U.S.C. § 5324.

[6] Count 21 was based on actions taken by Hinojosa and Novoa. Novoa gave Hinojosa $140,000 and asked him to clean the money. Hinojosa deposited the money in several of his own accounts using two separate transactions. He then wired money from his accounts to a bus company to purchase a bus for a band that Novoa managed.

acquittal because there was no evidence that he opened the clubs for the purpose of selling drugs. In *Chen*, we explained that "under § 856(a)(2), the person who manages or controls the building and then rents to others, need not have the express purpose in doing so that drug related activity take place." *Id.* He concedes that we cannot evaluate the merits of his claim based on the existing record, so he asks us to use our supervisory authority to remand to the district court for an evidentiary hearing.

Our typical practice is not to address ineffective assistance of counsel claims unless there is a record on the merits from the district court. *United States v. Higdon*, 832 F.2d 312, 313–14 (5th Cir. 1987); *United States v. Freeze*, 707 F.2d 132, 138–39 (5th Cir. 1983). We have applied that principle when a party asks for an evidentiary hearing rather than resolution on the merits. *United States v. Jones*, 969 F.3d 192, 199–200 (5th Cir. 2020). Though we have remanded for evidentiary hearings in conflict-of-interest cases, that issue is different than ineffective assistance of counsel. *United States v. Infante*, 404 F.3d 376, 393 (5th Cir. 2005); *United States v. Solado*, 339 F.3d 285, 291–92 (5th Cir. 2003). Because the practices of other circuits and policy arguments that Hinojosa advances do not warrant departing from our typical practice, we do not reach those arguments.

B

Casas and Rodriguez challenge the sufficiency of the evidence for their convictions under Counts 19 and 20. Hinojosa, Casas, and Rodriguez challenge the sufficiency of the evidence for their convictions on Count 25 and the jury's finding that the Count 25 drug conspiracy involved at least five kilograms of cocaine. When reviewing the sufficiency of the evidence, we consider whether the evidence, "viewed in the light most favorable to the verdict, would permit a rational trier of fact to find [the defendant] guilty beyond a reasonable doubt." *United States v. Sila*, 978 F.3d 264, 270

(5th Cir. 2020) (alteration in original) (internal quotations and citation omitted). Our review must consider countervailing evidence, as well as the evidence supporting the verdict. *Id.*

1

21 U.S.C. § 856(a)(2), the basis for Count 19 and the predicate of the conspiracy for Count 20, makes it a crime to:

> manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

The purpose prong applies to the person dealing or using the controlled substance, not the person who manages or controls the property. *Chen*, 913 F.2d at 190.

Conspiracy to manage a drug premises requires a finding that: (1) two or more people reached an agreement to manage a drug premises; (2) the defendant knew of the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully. 21 U.S.C. §§ 846, 856(a)(2).

Casas argues that if § 856(a)(2) imposes liability merely for failure to take action, it impermissibly lacks an *actus reus*. He further argues that if "making the place available" requires more than failure to remove drug dealers, there is no evidence that he completed that requirement. Casas challenges Count 20 based on the same arguments.

The government claims that because Casas based his sufficiency of the evidence objections on different grounds before the district court, the

grounds he provides now are reviewed for plain error.[7]  Casas argues that his claim that § 856(a)(2) must contain an *actus reus* is a constitutional claim (not a sufficiency of the evidence claim) and a claim he made before the district court.  Casas's claims fail on either standard of review.

Casas's analogy to strict liability, which is defined by a lack of a *mens rea* requirement, is inapposite to his argument that § 856(a)(2) lacks an *actus reus*.  The cases he cites discuss *mens rea* requirements, not the need for an *actus reus*.  Courts have upheld convictions based on failure to remove.  *See, e.g.*, *United States v. Safehouse*, 985 F.3d 225, 235 (3d Cir. 2021).  In any case, our court need not determine whether the statutory text "make available" and *Chen*'s language of "allow" require affirmative action or merely failure to act because there is evidence Casas acted to make the clubs available for drug sales.  He urged Hinojosa to resume allowing drug sales for the good of the business.  Hinojosa told Casas to give the drug dealers greater latitude to conduct sales.  We view the evidence in the light most favorable to the verdict, *Sila*, 978 F.3d at 270, and the jury could reasonably have assumed that Casas followed these instructions by instructing the security guards to allow drug sales.  Instructing the security guards constitutes action in furtherance of the illicit sales, meaning that Casas was not convicted merely for failure to take action.

Casas's challenge to Count 20 also fails.  Count 20 is a conspiracy charge so it does not require that Casas actually made a premises available for drug use, only that he agreed to do so.  The evidence that Hinojosa told

---

[7] Before the district court Casas argued there was insufficient evidence that he knew drugs were being sold and that there was an agreement to allow drug sales.  On appeal, he argues that "making a place available" requires more than failure to remove drug dealers and there was evidence he tried to stop drug sales.

Casas to be more flexible with drug dealers, without additional inference, is sufficient evidence of an agreement.

Rodriguez argues that there was no evidence that he was an owner, lessee, agent, employee, occupant, or mortgagee of the building. There was testimony that Rodriguez was one of the few people Hinojosa trusted, that Rodriguez was one of the top five decision makers for the clubs, that Rodriguez was second in the business behind Hinojosa, and that he had the authority to direct employees and make decisions for the club. There was also testimony that Rodriguez had authority over the security guards and instructed them to allow drug sales. On either standard, this was sufficient evidence to find that Rodriguez was an agent of the club.

2

Challenging their Count 25 convictions, Hinojosa, Casas, and Rodriguez argue that there is no evidence that any of them entered into an agreement with any of the drug dealers to possess cocaine with the intent to distribute it. They argue that mere knowledge, approval, or acquiescence in the object or purpose of a conspiracy is insufficient to prove participation. They claim a contrary conclusion would render § 856(a)(2) superfluous, contrary to traditional canons of interpretation. Rodriguez argues that there was no evidence he actually or constructively possessed cocaine. Because Hinojosa did not preserve error, plain error review applies to his claim. Because Casas and Rodriguez did, *de novo* review applies to their claims.

As detailed above, there was extensive evidence from which the jury could have inferred a tacit agreement. There was evidence that management allowed certain drug dealers to sell in the bathrooms, while rival drug dealers were removed. A drug dealer testified that Juan Lara, who oversaw most of the drug dealers who sold in the clubs, received permission from Hinojosa to resume sales in the clubs. Another drug dealer

testified that his supervisor received permission from Rodriguez to sell drugs in the bathrooms.   Reasonable minds may differ regarding the credibility of this testimony and the extent to which it implies an agreement. As detailed above, the evidence against the defendants goes beyond mere knowledge, approval, and acquiescence.[8] *See supra* IIA1.

Nor are we persuaded by the defendants' surplusage argument. Inferring an agreement from providing the location for the drug sales does not convert every § 856(a)(2) violation into a conspiracy to possess with intent to distribute.  A conspiracy requires the parties to share the purpose of the unlawful activity, whereas § 856(a)(2)'s purpose element only applies to the drug seller.  *Chen*, 913 F.2d at 190.   In other words, whether a defendant can be charged under § 856 and § 841 (conspiracy) depends on how he made his premises available for drug sales and whether those facts can support an inference of a tacit agreement.

3

Hinojosa, Casas, and Rodriguez argue that there was insufficient evidence to find that the alleged conspiracy to possess with intent to distribute involved at least five kilograms of cocaine.  Specifically, Hinojosa and Casas argue that there was insufficient evidence showing that they allowed drug sales to occur before 2014 and they can only be accountable for drug sales that occurred after they joined the conspiracy.  Rodriguez

---

[8] Rodriguez's argument about constructive possession also fails given the deferential standard of review.   Constructive possession is established by showing ownership, dominion, or control over the contraband itself or the premises containing the contraband.  *United States v. Salinas-Salinas*, 555 F.2d 470, 473 (5th Cir. 1977).  Given his standing in the business, Rodriguez had control over the premises containing the drugs. Given that he had control over the security guards, he could remove people as he saw fit. Additionally, because Count 25 is a conspiracy charge, what is relevant is that some conspirator had control over the building.  As the owner of the clubs, Hinojosa had control.

argues that the evidence was insufficient to show that he knew of the drug sales before 2015.[9]

On either standard of review, the drug quantity finding was proper. The parties do not dispute that the drug quantity can be calculated by estimating 50 grams sold per week. They dispute how many weeks can be attributed to the defendants. That number depends on when the defendants joined the conspiracy, which, because the conspiracy is based on tacit agreement, turns on when they knew the drug sales were occurring.

As detailed above, there was more than enough evidence from which the jury could have determined that the defendants joined the conspiracy as early as 2013, which would provide a sufficient number of weeks to reach the five-kilogram determination. *See supra* IIA1.

Casas also argues that there was additional evidence that he tried to stop drug sales through 2015. Viewing the evidence in the light most favorable to the verdict, this argument is unavailing. The record indicates periods of time when the clubs allowed rampant drug sales, allowed some drug sales while prohibiting others, and prohibited most or all sales. Casas claims that he told Luis Rendon, a security guard, to clean up the drug sales. Without more detail, one could infer that meant stopping drug sales altogether, making them more discreet, or getting rid of the unruly drug dealers while leaving the others. That action also must be viewed against the background that ubiquitous drug sales were occurring through 2015 and Casas had substantial control over security and their oversight of the

---

[9] Rodriguez challenges the jury instructions on the ground that they allowed the jury to convict without finding that the conspiracy involved at least five kilograms of cocaine. That is unsurprising, as whether a defendant is guilty of conspiracy and whether he receives a mandatory minimum because he meets a particular quantity threshold are separate questions.

bathrooms. In other words, the jury might have concluded that Casas's instruction to Rendon was less persuasive than the other evidence.

The arguments regarding Rodriguez are the same. He argues that the direct evidence of his knowledge of the drug sales is insufficient to establish five kilograms. The question is whether the ubiquity of drugs and his leadership position support an inference beyond a reasonable doubt that he knew about the drugs in earlier years. For the same reasons discussed regarding Hinojosa and Casas, there was sufficient evidence to support the inference.

## C

### 1

Casas challenges the sentencing enhancement that he received for perjury. A defendant receives a two-level enhancement for committing perjury. U.S.S.G. § 3C1.1. A defendant commits perjury if he provides "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Perez-Solis*, 709 F.3d 453, 469 (5th Cir. 2013) (citation and alterations omitted). Because Casas objected to the PSR's use of the two-level enhancement, the district court's factual finding that Casas obstructed justice is reviewed for clear error. *United States v. Juarez-Duarte*, 513 F.3d 204, 208 (5th Cir. 2008). There is no clear error if the finding is plausible considering the record as a whole, and deference is given to the district court's credibility determinations. *Id.*

Casas testified that he never opposed restrictions on drug sales in the bathrooms, had no knowledge of a 2016 meeting in which club management decided to resume allowing drug sales at the clubs, and was never instructed to allow drug sales to occur.

No. 22-10584

Detective Hodack testified that Casas participated in a meeting in 2015 or 2016 during which club management decided to resume allowing drug sales in the clubs because the lack of sales had decreased attendance by more than 50%. Novoa testified that Casas was part of a meeting around 2016 where club management decided to allow drugs sales to resume. Hinojosa, on a recorded phone call with Villareal, said that he told Casas to be more flexible with the drug dealers.

The Hodack and Novoa testimony contradict Casas's statement that he had no knowledge of a 2016 meeting where club management agreed to resume allowing drug sales. The Hinojosa phone call contradicts Casas's statement that he was never instructed to permit drug sales.

The conflict between Casas's testimony and the information provided by Hodack, Novoa, and Hinojosa, coupled with the reasonable determination that Casas was less credible, is enough to establish the falsity element of perjury. Whether Casas was involved in the decision to resume drug sales was plainly material to the case. As the district court thoroughly analyzed, Casas answered each question emphatically and unequivocally, supporting the finding that he was intentionally lying rather than confused, mistaken, or forgetful. The district court did not clearly err in applying a perjury enhancement.

2

Rodriguez challenges his sentence on the basis that the district court erred by attributing a drug quantity to him beyond that for which he was personally responsible and by giving him a manager enhancement despite insufficient evidence for that finding. Because Rodriguez objected to the manager enhancement, we review the district court's application of the sentencing guidelines *de novo* and its factual findings for clear error. *United States v. Bowen*, 818 F.3d 179, 192 (5th Cir. 2016).

The drug quantity argument is addressed above. The manager enhancement applies if the defendant exercised some degree of control over others involved in the commission of the offense. *See United States v. Delgado*, 672 F.3d 320, 345 (5th Cir. 2012) (en banc); *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir. 1990). There was extensive testimony that Rodriguez had control over whether the drug dealers could remain in the bathrooms selling drugs. Based on this evidence, the district court's factual findings did not constitute clear error. The district court's application of the manager enhancement was proper.

\* \* \*

For the foregoing reasons, the convictions and sentences of Hinojosa, Casas, and Rodriguez are AFFIRMED. Hinojosa's motion for an evidentiary hearing is DENIED.

No. 22-10584

Jennifer Walker Elrod, *Circuit Judge*, concurring:

I agree with the majority opinion that admission of the Josephine testimony and Hinojosa redacted statement were both harmless error. I write separately to explain why these harmless errors nevertheless constituted an abuse of discretion and *Bruton* error, respectively.

I

As the majority explains, Deputy Easterling testified that Josephine was arrested in 2017 while traveling from Texas to North Carolina with fourteen kilograms of cocaine and a computer drive containing business records related to the clubs. Hinojosa, Casas, and Rodriguez each claim that admission of the testimony was an abuse of discretion because the testimony was irrelevant and highly prejudicial.

Evidence is relevant if "it has any tendency to make a fact [material to determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant evidence is generally admissible unless "its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Fed. R. Evid. 402, 403. Evidentiary rulings are reviewed for abuse of discretion if the argument was preserved and for plain error if not preserved. *United States v. Nutall*, 180 F.3d 182, 189 (5th Cir. 1999) (discussing the standard for relevance); *United States v. Setser*, 568 F.3d 482, 495 (5th Cir. 2009) (discussing the standard for prejudice).

The relevance of the testimony is tenuous at best. There was no evidence that Josephine was traveling with anyone affiliated with Hinojosa's clubs, nor that the drugs in the car were tied to any of the drug dealers who sold at Hinojosa's clubs. Josephine was not on a trip for the clubs when she was arrested, and she was arrested in 2017, after drug sales at the clubs had ceased. The records found in the car contained routine payroll information and contained no information about drug sales at the clubs.

No. 22-10584

Testimony about the arrest lacked any connection to any of the charges except that someone associated with the clubs was found with a large quantity of drugs. The association between the defendants and Josephine does not make her actions relevant absent some connection to the business or alleged conspiracy.  That lack of relevance makes it very easy for the testimony to be more prejudicial than probative. The testimony created the impression that the clubs were engaged in large-scale drug-trafficking. The jury instruction warning the jury that mere association does not prove a conspiracy may have limited the prejudicial effect of the testimony, but it did not make it more relevant.  Even factoring in the jury instruction, the testimony about Josephine should have been excluded because there was a substantial danger that it was more prejudicial than probative.

## II

As the majority also explains, Casas and Rodriguez challenge the admission of a redacted statement that Hinojosa made to the government on the ground that it violates the Sixth Amendment.  A defendant's Sixth Amendment right to confront witnesses against him is violated when:  (1) "several co-defendants are tried jointly"; (2) "one defendant's extra-judicial statement is used to implicate another defendant"; and (3) "the confessor does not take the stand."  *United States v. Restrepo*, 994 F.2d 173, 186 (5th Cir. 1993) (citing *Bruton v. United States*, 391 U.S. 123, 127 (1968)). This is a so-called *Bruton* error.

Here, a redacted portion of Hinojosa's confession was admitted during trial.[1]  The admitted statement was:

---

[1] At one point, Hinojosa decided to plead guilty and made admissions to the government. He later decided not to plead guilty.

26

Question: And so who is the one bringing you these complaints about the drugs.

Hinojosa: It could be the manager, it could be the promotion's guy . . . Because that's—that's the first people to hear the complaints.

The Supreme Court recently reaffirmed that confessions that directly implicate a co-defendant fall within *Bruton*, while those that do so indirectly do not. *Samia v. United States*, 599 U.S. 635, 647 (2023). The fact that an inference is required does not necessarily mean implication is indirect. *Id.* at 652 (citing *Gray v. Maryland*, 523 U.S. 185, 195 (1998)) (explaining that admissibility must depend on the *kind* of inference because use of descriptions like "the red-haired, bearded, one-eyed man with a limp" surely fall within *Bruton*). Direct implication can occur when a statement is redacted to remove a defendant's name, yet still obviously refers to the defendant. *Id.* at 653 (citing *Gray*, 523 U.S. at 196 (explaining that the blanks would cause the jurors to speculate as to whom the blanks refer)). By contrast, if a redacted statement only implicates the co-defendant in conjunction with other evidence, there is no confrontation clause violation. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987).

Casas and Rodriguez are not directly implicated by the redaction itself. The redacted statement did not contain "deleted" or other fillers that would cause the jurors to speculate as to whom the blanks referred. On the contrary, reading the redacted statement, one does not know information has been removed.

Whether the references to "manager" and "promotion's guy" directly implicate Casas and Rodriguez poses a closer question. The indictment listed multiple managers and promoters. However, Hinojosa's statement referenced "the manager," not "a manager," arguably

implicating Casas as the general manager of the clubs. Rodriguez, in the indictment, was introduced as the manager in charge of monthly promotions while Novoa, the other promoter, was introduced as Hinojosa's protégé without reference to his role as a promoter.

Given their status in the business and prominence at trial, the reference to their job titles implicated Casas and Rodriguez just as a reference to the owner would implicate Hinojosa. The jury did not need any additional evidence to think that Hinojosa's statement referenced Casas and Rodriguez. To be sure, references to "the manager" and "the promotion's guy" do not implicate with the same level of certainty as would a reference to "a red-haired, bearded, one-eyed man." *Gray*, 523 U.S. at 196. However, I read *Gray*'s example of a red-haired, bearded, one-eyed man as an extreme one used to illustrate a point, not as defining the level of uniqueness required for direct implication. Here, the use of the titles "manager" and "promotion's guy" were sufficiently specific to directly implicate Casas and Rodriguez.

The risk of a violation is heightened by the lack of a jury instruction. *Samia*'s holding that no *Bruton* violation occurs when a party is only indirectly implicated relied in part on the fact that the district court provided a limiting instruction to the jury. *Samia*, 599 U.S. at 640. Here, no limiting instruction was given.

*       *       *

I agree that admission of the Josephine testimony and redacted statement were harmless error, given the extensive evidence against the defendants. But I would have also held that admission of the Josephine testimony was an abuse of discretion and the admission of the redacted statement was *Bruton* error. I concur.